Keith D. Nowak
Andriy R. Pazuniak
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, New York 10005
(212) 732-3200
nowak@clm.com
pazuniak@clm.com

Alex Gertsburg                          George Pazuniak
THE GERTSBURG LAW FIRM                  O'KELLY ERNST & BIELLI, LLC
36 South Franklin St.                   901 N. Market St., Suite 1000
Chagrin Falls, OH 44022                 Wilmington, DE 19801
(440) 571-7775                          Tel: 302-478-4230
ag@gertsburglaw.com                     GP@del-iplaw.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**RATES TECHNOLOGY INC.,**

                  **Plaintiff,**

      **-against-**

**BROADVOX HOLDING COMPANY, LLC,**
**CYPRESS COMMUNICATIONS OPERATING**
**COMPANY, LLC and ABC COMPANIES, 1 TO 10,**

                **Defendants.**

**Case No. 1:13-cv-00152 (LTS) (SN)**

**DEFENDANTS' ANSWERING CLAIM CONSTRUCTION BRIEF**

## Table of Contents

I.      SUMMARY OF CLAIM CONSTRUCTIONS AND RESPONSE TO RTI ...........- 1 -

II.     LAW OF CLAIM CONSTRUCTION .................................................................- 3 -

    A.      General Rule of Claim Construction.....................................................- 3 -

    B.      The Prosecution Histories Are Dispositive...........................................- 4 -

    C.      Expert Testimony Cannot Change the Intrinsic Record ...............................- 6 -

    D.      Means-Plus-Function Limitations Are Governed by 35 U.S.C. §112(f) ......- 8 -

III.    CLAIM CONSTRUCTIONS -- PATENT 5,425,085...........................................- 13 -

    A.      General Overview ................................................................................- 13 -

    B.      Housing Forming Enclosure ................................................................- 15 -

    C.      Jack Means...........................................................................................- 17 -

    D.      Switch Means........................................................................................- 17 -

    E.      Disconnecting .......................................................................................- 22 -

    F.      Means operatively connected to said switch means for generating a current- 23 -

    G.      Means … for detecting and storing said telephone number .......................- 25 -

    H.      Means for addressing said database .........................................................- 26 -

    I.      Means … for comparing the cost rate of each path ....................................- 26 -

    J.      Means … for generating a number sequence...........................................- 29 -

IV.     CLAIM CONSTRUCTIONS -- PATENT 5,519,769...........................................- 30 -

    A.      General Overview of Patent 5,519,769.....................................................- 30 -

    B.      At a predetermined time and date ............................................................- 31 -

    C.      A data transfer line................................................................................- 32 -

    D.      Call rating device ..................................................................................- 33 -

    E.      Transmitting over the data transfer line ...................................................- 33 -

    F.      Indicia ..................................................................................................- 34 -

    G.      Verifying ..............................................................................................- 34 -

    H.      Transmitting ..........................................................................................- 35 -

V.      CONCLUSION...................................................................................................- 36 -

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*,
   707 F.3d 1318 (Fed. Cir. 2013)...............................................................................16

*Alpex Computer Corp. v. Nintendo Co.*,
   102 F.3d 1214 (Fed. Cir. 1996)..................................................................................9

*Andersen Corp. v. Fiber Composites, LLC*,
   474 F.3d 1361 (Fed. Cir. 2007)..................................................................................6

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
   521 F.3d 1328 (Fed. Cir. 2008).....................................................................8, 12, 13

*Aventis Pharms., Inc. v. Amino Chems. Ltd.*,
   715 F.3d 1363 (Fed. Cir. 2013)..................................................................................7

*BASF Agro B.V. v. Makhteshim Agan of N. Am., Inc.*,
   519 Fed. Appx. 1008 (Fed. Cir. 2013)......................................................................7

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
   713 F.3d 1090 (Fed. Cir. 2013)..................................................................................4

*Blackboard, Inc. v. Desire2Learn Inc.*,
   574 F.3d 1371 (Fed. Cir. 2009)..............................................................................8, 9

*CVI/Beta Ventures, Inc. v. Tura LP*,
   112 F.3d 1146 (Fed. Cir. 1997)..................................................................................5

*Dealertrack, Inc. v. Huber*,
   674 F.3d 1315 (Fed. Cir. 2012)................................................................................12

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
   673 F.3d 1361 (Fed. Cir. 2012)..................................................................................8

*Function Media, L.L.C. v. Google Inc.*,
   708 F.3d 1310 (Fed. Cir. 2013)............................................................................8, 12

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l*,
   222 F.3d 951 (Fed. Cir. 2000)....................................................................................5

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
   430 F.3d 1377 (Fed. Cir. 2005)................................................................................11

ii

*J & M Corp. v. Harley-Davidson, Inc.*,
    269 F.3d 1360 (Fed. Cir. 2001).............................................................10

*Kara Tech. Inc. v. Stamps.com Inc.*,
    582 F.3d 1341 (Fed. Cir. 2009)...............................................................7

*Kruse Tech. P'ship v. Volkswagen Ag & Volkswagen Group of Am.*,
    2013 U.S. App. LEXIS 20457 (Fed. Cir. 2013) ......................................3

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
    382 F.3d 1354 (Fed. Cir. 2004).............................................................10

*Masco Corp. v. United States*,
    303 F.3d 1316 (Fed. Cir. 2002).............................................................11

*MediaCom Corp. v. Rates Tech., Inc.*,
    4 F. Supp. 2d 17 (D. Mass. 1998) ("*MediaCom I*")....................... passim

*MediaCom v. Rates Technology Inc.*,
    34 F.Supp.2d 76 (D. Mass. 1998) ("*MediaCom II*") ....................2, 22, 23

*Noah Sys. Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012)...............................................................8

*Rembrandt v. AOL*,
    641 F.3d 1331 (Fed. Cir. 2011).........................................................11, 12

*Saffran v. Johnson & Johnson*,
    712 F.3d 549 (Fed. Cir. 2013)...........................................................6, 10

*Seachange Int'l, Inc. v. C-COR Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005)...............................................................5

*Uship Intellectual Props., LLC v. United States*,
    714 F.3d 1311 (Fed. Cir. 2013)...............................................................6

## STATUTES

35 U.S.C. §112(f).................................................................................... passim

35 U.S.C. § 307..............................................................................................1

iii

**OTHER AUTHORITIES**

Fed. R. Civ. P. Rule 11 ..................................................................................................2

Fed. R. Civ. P. Rule 12 ..................................................................................................1

Pursuant to Pre-Trial Scheduling Order No. 1 and Local Patent Rule 12, defendants Broadvox Holding Company, LLC ("Broadvox") and Cypress Communications Operating Company, LLC ("Cypress") (collectively, "Defendants") hereby respond to the Opening Claim Construction Brief of Plaintiff Rates Technology Inc. ("RTI") (DI 84).

## I.     SUMMARY OF CLAIM CONSTRUCTIONS AND RESPONSE TO RTI

Plaintiff RTI's "Opening Claim Construction Brief" fails as a legal instrument.  The two patents in suit are the products of reexamination proceedings in the United States Patent and Trademark Office ("Patent Office" or "PTO").  That is, after the original patents were issued, both patents were returned to the Patent Office for a reexamination, where the claims were reconsidered in light of new prior art which had not been considered in the original prosecution. The claims in suit are those issued from the two reexamination proceedings.  35 U.S.C. § 307.

During those reexaminations, RTI detailed and limited the meaning of the various terms in both patents to overcome the prior art.  In the '085 Patent reexamination, RTI also had to add limitations to distinguish over the prior art.  Thus, these two reexaminations are critical and largely dispositive of the claim construction issues as a matter of law, because the two claims in suit are the product of those proceedings.

Yet, RTI never refers to either reexamination.  RTI's purported "expert" repeats the mantra in virtually every paragraph that his arguments are supported by the "prosecution history," but he never cites to any prosecution history (except for one inconsequential point from an original prosecution) and, in fact, his constructions conflict with it.  RTI and its "expert" repeatedly propose constructions that are directly contradicted by the prosecution history and the positions RTI took during the reexaminations to maintain its patents.  RTI cannot assert one

position before the Patent Office in order to obtain a patent, and then assert a conflicting position in order to sue on it.

RTI and its "expert" not only ignored the relevant record as they made-up their constructions, but they also ignored prior judicial decisions that expressly rejected their positions. In two separate decisions—*MediaCom Corp. v. Rates Tech., Inc*., 4 F. Supp. 2d 17 (D. Mass. 1998) ("*MediaCom I*") and *MediaCom v. Rates Technology Inc.*, 34 F.Supp.2d 76, 79 (D. Mass. 1998) ("*MediaCom II*")—the United States District Court for the District Massachusetts rejected the same claim constructions RTI asserts here. Although RTI cites to these decisions in its brief (DI at 1, 4, 12), RTI fails to inform the Court of the *MediaCom* holdings or attempt to distinguish the prior judicial findings against RTI.

Ultimately, RTI's brief fails as a legal document because RTI repeatedly distorted case law, ignored other critical case law that defeats its arguments as a matter of law, and essentially made-up law as it went along—arguing positions that have no foundation in the law and contradict basic patent principles.

<u>Defendants' Pending Rule 11 Motion</u>

RTI's claim construction "brief" has one additional consequence. Defendants have filed a motion under Fed. R. Civ. P. Rule 11 for sanctions, because RTI filed its Complaint without a proper basis, including never having construed the claims, much less applied them to Defendants' activities.

RTI's submission now confirms that, in defiance of established governing law, RTI had never reviewed, much less applied, the prosecution history of the patents upon which it had sued. Construction of any one of several elements of both the '085 and '769 patent claims would have

- 2 -

immediately negated any legitimate basis for pleading infringement.  The parties are here only

because, as RTI's brief unfortunately proves, RTI had never read the prosecution history of its

own patents.

## II.    LAW OF CLAIM CONSTRUCTION

### A.  General Rule of Claim Construction

The general rule of claim construction is well established.

> "[W]ords of a claim are generally given their ordinary and
> customary meaning," which is the "the meaning that the term
> would have to a person of ordinary skill in the art in question at the
> time of the invention."  "[T]he claims themselves," "both asserted
> and unasserted," "provide substantial guidance as to the meaning
> of particular claim terms."  "[T]he context in which a term is used
> in the asserted claim can be highly instructive."  Also, "[a] claim
> must be read in accordance with the precepts of English grammar."

*Kruse Tech. P'ship v. Volkswagen Ag & Volkswagen Group of Am.*, 2013 U.S. App. LEXIS

20457, at 12 (Fed. Cir. 2013) (internal citations omitted).

RTI devotes a significant portion of its brief to arguing that claims are construed as

would a skilled artisan.  (DI 84 at 2-3.)  RTI can argue that proposition, however, only to the

extent allowed by the law, the specifications and the prosecution history.  The rule of "ordinary

and customary meaning" does not apply when cases are governed by 35 U.S.C. §112(f), or when

the prosecution history mandates a different construction .  The Court must interpret claims by

considering the language of the claims themselves, the specifications and the prosecution history

of those claims—what is known as "intrinsic evidence."  Furthermore, the Court must follow the

law, including the statutory requirements of § 112(f), which RTI ignores.  These are the

- 3 -

dispositive considerations here.[1]

### B.  <u>The Prosecution Histories Are Dispositive</u>

The primary source for claim construction is intrinsic evidence, which consists of the claim language itself, the specification and the prosecution history of the claims.  Of the three categories, the prosecution history is the most important, particularly when the PTO proceedings require patentees to define their terms or disavow coverage that would otherwise have applied.  Thus, the Federal Circuit has stated that:

> Prosecution history disclaimer plays an important role in the patent system.  It "promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." … [T]he entirety of a patent's file history captures the public record of the patentee's representations concerning the scope and meaning of the claims.  … Competitors are entitled to rely on those representations when determining a course of lawful conduct, such as launching a new product or designing-around a patented invention.  Beyond the notice function and reliance-based aspects of a patent's prosecution history, it "provides evidence of how the [PTO] and the inventor understood the patent."

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) (internal citations omitted).  Prosecution history can dictate the meaning of claim terms when the inventor effectively defined the terms or disclaimed claim coverage to overcome the prior art:

> [I]n construing the claim, we consider the prosecution history to determine "whether the patentee disclaimed or disavowed subject matter, narrowing the scope of the claim terms."  In doing so, we examine … all arguments to overcome and distinguish references.  Where an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection,

---

1   RTI begins its brief (DI 84 at 1) with a discussion of whether claim construction is a matter of law or fact or a mixed question.  Whether a question of law, fact or mixed, however, the rules of claim construction do not change, and it is a matter for the Court and not a jury.

the argument may serve to narrow the scope of otherwise broad
claim language.

*Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1372-1373 (Fed. Cir. 2005) (internal

citations omitted).

The arguments and representations of an inventor made in the Patent Office are binding

in claim construction.  *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1158 (Fed. Cir. 1997)

(observing that statements made during prosecution commit the inventor to a particular meaning

of a claim term that is binding during litigation).  This remains true even if the inventor's

statements result in claim language not having its ordinary and customary meaning.  *Hockerson-*

*Halberstadt, Inc. v. Avia Group Int'l*, 222 F.3d 951, 956 (Fed. Cir. 2000) ("Review of the

prosecution history, however, reveals that the inventor disclaimed a particular interpretation of

groove, thereby modifying the term's ordinary meaning.").  Inventors cannot retract what they

said in the Patent Office, because that would defeat the public-notice function of the patent

system:

> HHI's argument therefore reduces to a request for a mulligan that
> would erase from the prosecution history the inventor's disavowal
> of a particular aspect of a claim term's meaning.  Such an
> argument is inimical to the public notice function provided by the
> prosecution history.  The prosecution history constitutes a public
> record of the patentee's representations concerning the scope and
> meaning of the claims, and competitors are entitled to rely on
> those representations when ascertaining the degree of lawful
> conduct, such as designing around the claimed invention.  In the
> present case, the inventor's statements about groove width are
> part of the prosecution history and form the totality of the public
> record upon which competitors rely.  Were we to accept HHI's
> position, we would undercut the public's reliance on a statement
> that was in the public record and upon which reasonable
> competitors formed their business strategies.

*Hockerson-Halberstadt*, 222 F.3d at 957.

- 5 -

Indeed, it does not even matter whether RTI's arguments were persuasive or followed by the PTO, because

> The fact that the applicant may have given up more than was necessary does not render the disclaimer ambiguous. The analysis focuses on what the applicant said, not on whether the representation was necessary or persuasive: "Regardless of the examiner's motives, arguments made during prosecution shed light on what the applicant meant by its various terms."

*Uship Intellectual Props., LLC v. United States*, 714 F.3d 1311, 1315-16 (Fed. Cir. 2013); *see also Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013) ("[A]n applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well."); *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007).

## C.  <u>Expert Testimony Cannot Change the Intrinsic Record</u>

RTI assumes that it can make the claims say anything by simply filing a declaration of an alleged expert, even though the expert's declaration failed to analyze—or even cite—the relevant prosecution histories or the prior judicial constructions of the claims.  Leaving to one side whether RTI should have filed an expert declaration that did not consider the relevant intrinsic evidence, RTI is wrong to rely on any expert, because this approach conflicts with the law. Expert testimony has minimal (if any) relevance in claim construction.  It is for that reason courts regularly ignore expert testimony and rely solely on intrinsic evidence.  Thus, the Federal Circuit has recently noted:

> Aventis's  reliance on expert testimony that one of ordinary skill in the art would know that "substantially pure" can mean different things when describing intermediates than when describing end products is not enough to overcome the persuasive intrinsic record in this case.

- 6 -

*Aventis Pharms., Inc. v. Amino Chems. Ltd*., 715 F.3d 1363 (Fed. Cir. 2013).  In another recent

case, the Federal Circuit found that expert testimony is only relevant in limited circumstances

where there is ambiguity in the intrinsic record and technical explanations relating to the state of

the art would be helpful in resolving the issues.  The court, however, emphasized that an expert's

construction of a claim is generally irrelevant and can never contradict the intrinsic record:

> Generally, a patent's intrinsic record does not warrant consideration of extrinsic evidence.  Where a patent's claims, written description, and prosecution history are complete and unambiguous, a court need not resort to extrinsic evidence such as treatises, technical references, or <u>expert testimony</u>.  Where the intrinsic record leaves ambiguities and unresolved questions, however, a court may consider extrinsic evidence, including expert testimony.  … To this end, we have been careful to distinguish between, on one hand, expert testimony on the state of the art, and on the other hand, expert testimony regarding the proper construction of a disputed claim term.  The latter should play a more limited role in a court's analysis, especially where the intrinsic record is self-evident.
>
> In any event, <u>extrinsic evidence cannot vary the terms of the claims or otherwise contradict the intrinsic record.  Accordingly, expert testimony inconsistent with the intrinsic record has little if any probative value.</u>

*BASF Agro B.V. v. Makhteshim Agan of N. Am., Inc*., 519 Fed. Appx. 1008, 1015-1016 (Fed. Cir.

2013) (emphases supplied).  *See also Kara Tech. Inc. v. Stamps.com Inc*., 582 F.3d 1341, 1348-

1349 (Fed. Cir. 2009) ("A court should discount any expert testimony that is clearly at odds with

the claim construction mandated by the claims themselves, the written description, and the

prosecution history, in other words, with the written record of the patent.").

The declaration of RTI's expert not only suffers from the typical limitations that apply to

any expert, but should not be considered at all in this case, because

(1) the expert attempts to contradict the intrinsic evidence, which is impermissible as a

- 7 -

matter of law; and

(2) RTI's expert did not analyze the prosecution history of the patents or the prior

*MediaCom* decisions, thus the expert's declaration is irrelevant.

**D.  Means-Plus-Function Limitations Are Governed by 35 U.S.C. §112(f)**

Most of the '085 Patent claim 1 is written in the means-plus-function format—these are

the limitations that have the word "means" in them, such as "switch means."  A "means"

limitation is governed by a special statute, 35 U.S.C. § 112(f), which states:

> (f) Element in Claim for a Combination.— An element in a claim
> for a combination may be expressed as a *means* or step for
> performing a specified function without the recital of structure,
> material, or acts in support thereof, and such claim shall be
> construed to cover the corresponding structure, material, or acts
> described in the specification and equivalents thereof. (Emphasis
> supplied.)

Thus, the statute limits a means-plus-function element of a claim to the specific structure

described in the specification that performs the stated function.  A patentee must link each

function to a defined structure.  The reason for the rule is to "prevent … pure functional

claiming."  *Function Media, L.L.C. v. Google Inc*., 708 F.3d 1310, 1319 (Fed. Cir. 2013); *Noah

Sys. Inc. v. Intuit Inc*., 675 F.3d 1302, 1317 (Fed. Cir. 2012); *Ergo Licensing, LLC v. CareFusion

303, Inc.*, 673 F.3d 1361, 1363 (Fed. Cir. 2012) ("Failure to specify the corresponding structure

in the specification amounts to impermissible pure functional claiming"); *Blackboard, Inc. v.

Desire2Learn Inc*., 574 F.3d 1371, 1385 (Fed. Cir. 2009); *Aristocrat Techs. Australia Pty Ltd. v.

Int'l Game Tech*., 521 F.3d 1328, 1333 (Fed. Cir. 2008).  In *Blackboard*, for example, the Federal

Circuit rejected the patentee's argument that an "access control manager" could be "any

computer-related device or program that performs the function of access control," because the

patentee failed to link the function—access control—to a specific device. *Blackboard*, 574 F.3d at 1383. The patentee could not claim patent protection over "any" device or program that performed access control.

In order to avoid the means-plus-function requirement of § 112(f), RTI proposes two spurious positions. First, RTI argues that § 112(f) does not apply because its claims do not encompass mean-plus-function elements—even though the claims contain "means" limitations that RTI added to its claims in order to get its patents issued. Alternatively, if the "means" limitations are governed by § 112(f)—as they must be—RTI proposes broad functional language without linking the claimed functions to any specific structure defined in the specification.

RTI's first point is legally foreclosed by its prosecution history. As detailed below, in order to obtain claim 1 of the '085 Patent, RTI had to distinguish the prior art and, therefore, included "means" limitations that are governed by § 112(f) in order to do so. RTI cannot now retract the position it asserted before the PTO. *Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214, 1220 (Fed. Cir. 1996) ("[§112(f)] requires that we construe a means-plus-function claim in view of the structure disclosed in the specification of the patent. Statements made during the prosecution relating to structures disclosed in the specification are certainly relevant to determining the meaning of the means-plus-function limitations of the claims at issue."). RTI had an opportunity in the Patent Office to make its present arguments, but chose not to do so. It cannot now ask the Court to undo the Patent Office's work and rewrite the '085 Patent claims. RTI cannot assert a position in order to maintain its patent, and then assert a contrary one when suing on it.

RTI's second point lacks any merit, because the law is beyond dispute that construction

- 9 -

of a means-plus-function element must include the structure defined in the specification.  Indeed, RTI did just that in the Patent Office—it linked each "means" limitation to an exact structure in the specification, as required by law.  *Saffran v. Johnson & Johnson*, 712 F.3d 549, 561-562 (Fed. Cir. 2013)  (a "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.  This duty to link or associate structure to function is the quid pro quo for the convenience of employing [§112(f)]").

Contrary to what it did in the PTO, RTI now defines the "means" by simply parroting the function recited in the claim without citing to any specific corresponding structure.  RTI has not—and cannot—cite any legal support for its arguments.  RTI is engaging in "pure functional claiming" which the law prohibits.  *See, e.g.*, *J & M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360 (Fed. Cir. 2001) ("The literal scope of a properly construed means-plus-function limitation does not extend to all means for performing a certain function.  Rather, the scope of such claim language is sharply limited to the structure disclosed in the specification and its equivalents.").

RTI also misquotes *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1359-1360 (Fed. Cir. 2004) (DI 84 at 4-5).  RTI suggests that the Federal Circuit was addressing a means-plus-function element.  The court, however, was considering the claim terms "a connector assembly," which was <u>not</u> a means limitation.  The defendants in *Lighting World* argued that the plaintiff's claims encompassed so many products that the limitations should be treated *like* means limitations governed by § 112(f), but the claims did not actually contain means limitations.  Conversely, in this case, RTI's claims *do* contain means limitations that *are* governed by § 112(f).  Contrary to RTI's implication, the Federal Circuit never suggested that a

- 10 -

"means" limitation governed by § 112(f)—such as the means limitations contained in RTI's claims—can cover a multitude of structures.

RTI next cites *Masco Corp. v. United States*, 303 F.3d 1316, 1328 (Fed. Cir. 2002), for the proposition that, "[j]ust as a claim may describe 'structure' for a term, it may describe an 'act' that removes it from the auspice of section 112(f)."  (DI 84 at 5.)  *Masco*, however, is entirely inapplicable in this case.  In *Masco*, the court considered a <u>step</u>-plus-function element in a <u>method</u> claim.  This case involves a <u>means</u>-plus-function element in a <u>product</u> claim and, based on the plain language of § 112(f), an act may not be a substitute for the structure required in a means limitation.  A step-plus-function element in a method claim is not interchangeable with a means-plus-function element in a product claim.  If a product claim includes a method element, then the claim is invalid.  *Rembrandt v. AOL*, 641 F.3d 1331, 1339 (Fed. Cir. 2011) ("[R]eciting both an apparatus and a method of using that apparatus renders a claim indefinite under section 112, paragraph 2."); *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005).  Given that the rules for step-plus-function elements cannot apply to a product claim—the type of claim at issue in this case—RTI's citation to *Masco* is without basis and misleading.

RTI cites to *Rembrandt*, repeatedly, to argue that § 112(f) does not apply to its "means" element, because allegedly the "means" limitation is sufficiently structural to a person skilled in the art.  *Rembrandt*, however, is entirely inapposite.  In *Rembrandt*, the Federal Circuit held that § 112(f) did not apply to two of the claim terms: "trellis encoding means" and "fractional rate encoding means."  *Rembrandt*, 641 F.3d at 1340-41.  The record in that case showed that both a "trellis encoder" and a "fractional rate encoder" were defined technical algorithms that would be recognized by a person skilled in the art *based on prior publications and published patents.  Id.*

- 11 -

at 1341.[2]  Thus, unlike RTI's claims at issue here, the *Rembrandt* claims sufficiently defined the structure performing the claimed function.  *Rembrandt* did not swallow-up § 112(f) and allow a patentee to circumvent the statute simply by presenting an "expert" who says, without any analysis or reference to prior art, that the term was sufficiently structural at the time of the invention.  And, *Rembrandt* certainly does not apply when there is <u>no</u> structure shown in the claim, but merely a function.  *See, e.g.*, *Function Media*, 708 F.3d at 1319 ("'[A] patentee cannot avoid providing specificity as to structure simply because someone of ordinary skill in the art would be able to devise a means to perform the claimed function.'" (quoting *Blackboard*, 574 F.3d at 1385)); *Aristocrat Techs.*, 521 F.3d at 1336-37 ("'[C]onsideration of the understanding of one skilled in the art in no way relieves the patentee of adequately disclosing sufficient structure in the specification.'" (quoting *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1380 (Fed. Cir. 1999))).  *Rembrandt* did not rewrite patent law and allow "pure functional claiming." Ultimately, RTI must sufficiently define a structure to perform the claimed functions, and it has entirely failed to do so.  *See Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1329 (Fed. Cir. 2012) ("The indicated structure must limit the claim so as not to allow pure functional claiming.").

Finally, RTI also suggests that its means-plus-function limitations, even if governed by § 112(f), can have the structure defined as a "logic" or "logic operations" to perform the specified function.  (DI 84 at 14, 15, 16, 17, 18.)  Thus, for every means-plus-function element, RTI argues that "[s]tructure should be logic (e.g., routine or subroutine) having operations that [perform the stated function]."  This is legally indefensible.  This is exactly the type of language

---

[2]  Moreover, in *Rembrandt*, the parties did <u>not</u> dispute that the terms were sufficiently defined algorithms.  *Rembrandt*, 641 F.3d at 1341.

that the Federal Circuit has repeatedly rejected as "pure functional claiming."  "Logic" is not a

structure.  RTI cites no support for the proposition that "logic" can be a structure by itself

without a defined structure, and there is none.  It is yet another example of RTI making-up law

contrary to established precedent.

Indeed, even citing a generic structure, such as a computer, is insufficient.  Thus, in

*Aristocrat Technologies*, the Federal Circuit held that

> The point of the requirement that the patentee disclose particular
> structure in the specification and that the scope of the patent claims
> be limited to that structure and its equivalents is to avoid pure
> functional claiming.  … "If the specification is not clear as to the
> structure that the patentee intends to correspond to the claimed
> function, then the patentee has not paid the price but is attempting
> to claim in functional terms unbounded by any reference to
> structure in the specification."…For a patentee to claim a means
> for performing a particular function and then to disclose only a
> general purpose computer as the structure designed to perform that
> function amounts to pure functional claiming.  Because general
> purpose computers can be programmed to perform very different
> tasks in very different ways, simply disclosing a computer as the
> structure designated to perform a particular function does not limit
> the scope of the claim to "the corresponding structure, material, or
> acts" that perform the function, as required by[§112(f)].

*Aristocrat Techs.*, 521 F.3d at 1333.

## III.  CLAIM CONSTRUCTIONS -- PATENT 5,425,085

### A.  General Overview

RTI filed the application leading to the issuance of Patent 5,425,085 on March 18, 1994,

and the patent issued shortly thereafter on June 13, 1995.  On February 14, 2006, a third-party

filed a Request for Ex Parte Reexamination (the "Reexamination").  The prosecution of the

Reexamination continued from February 2006 through August 11, 2009, when the revised patent

claims were finally published.  The pertinent portions of the record of the Reexamination, as

- 13 -

downloaded from the Patent Office, are A-1 through A-378 in the Appendix.

The Reexamination presented a series of new prior art that had not been previously considered. Based on the new prior art, the Patent Office rejected all the original claims of the '085 Patent, and RTI appealed to the Board of Patent Appeals. In order to overcome the new prior art, RTI added new limitations to claim 1, and repeatedly and consistently maintained that the claims were very narrow. RTI distinguished the prior art based on these very narrow definitions. RTI filed a detailed appellate brief that explained the limitations of the proposed claims and distinguished the prior art based on the newly-revised, narrowly-interpreted definitions. After the appellate brief was filed (but before the appeal was lodged with the Board), the Patent Office reconsidered its prior rejection, and allowed the revised claims with an explanation that principally followed RTI's arguments in the appellate brief. Thus, the Patent Office only allowed claim 1 after RTI added new limitations to the claim.

RTI's appellate brief concluded that its least-cost-routing system (or "LCR") invention depended on certain defined structures that provided functions. For example, the appellate brief described a "switch means" that disconnected the telephone signals from the network while allowing the electrical current to flow through the same switch means to the telephones:

> LCR can be successfully implemented in the patented device only by providing operating current to the disconnected telephone through the switch means, as call routing is being performed. The references … have no comparing means. They do not have the required switch means the telephones of the systems of the references are powered by the telephone interface of the systems and not do not depend upon current from the telephone network to operate.

(A-306.) After RTI filed its final remarks and its appellate brief, the PTO reconsidered its rejection and allowed the amended claims to issue as a patent. In its decision allowing the

- 14 -

claims, the PTO recited the exact same structural elements of claim 1 that RTI cited in its appellate brief.  (A-365-367.)  These structural elements were the heart of RTI's case before the Patent Office, and is a critical issue before the Court in deciding claim construction.

### B.  Housing Forming Enclosure

"a housing forming an enclosure and comprising *first jack means* for connection to said first telephone and *second jack means* for connection to said network"

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| One or more housings forming one or more enclosures.<br><br>Comprising is a transition term linking the preamble to the body of the claim | *Amended*:<br>A unitary physical structure that includes a first jack means for connection to said first telephone and a second jack means for connection to said network. |

The difference between the parties' constructions is whether both the first and second jack means need to be contained or included in a single housing.  According to RTI's definition, the claim encompasses one "housing" that includes a first jack means, and an entirely separate second "housing" that includes the second jack means.  (DI 84 at 9-10.)  Defendants' construction requires that a single housing include both the first and second jack means.

The '085 Patent only refers to one single housing that includes both the first and second jack means.  As shown below, the '085 Patent consistently and exclusively refers to "A housing" or "the housing":

- 15 -

<u>'085 Patent at Abstract</u>:  "A housing forms an enclosure and has a first jack for interconnection to the phone side of the phone line and a second jack for interconnection to the network side of the phone line."

<u>Col 1 lines 59-63</u>: "A housing forms an enclosure and has jacks mounted on the housing for interconnection to the phone line.  A first jack interconnects to the phone side of the phone line and a second jack interconnects to the network side of the phone line."

<u>Col 3 lines 35-39</u>:  As shown in the drawings, the housing includes a first jack 24 for connecting "plugging" to the phone side of the phone line 12 and a second jack 25 for connection or "plugging" to the network side of the phone line.



Nothing in the claims, specifications or prosecution history suggests that the invention encompasses a second housing, i.e. a construct that has one housing with a first jack means and an entirely separate second housing with a second jack means.  Indeed, the entire concept of the invention was that there would be <u>one</u> housing that enclosed <u>all</u> the elements of the claims.  *See* Abstract, 1:63-64 ("The device components are contained in the enclosure"); Abstract, 3:40-41 ("The electronic components forming the device are mounted within the enclosure").

The plain and natural reading of the claim language is consistent with the specification that there is a single housing enclosing both the first and second jack means.  RTI nevertheless argues that the term "a housing" is "an open-ended term here and means one or more" and cites to *Accent Packaging, Inc. v. Leggett & Platt, Inc*., 707 F.3d 1318, 1326 (Fed. Cir. 2013).  RTI also argues that "comprising" means "including" and the housing may include other components.

- 16 -

RTI's straw-man arguments, however, do not address the key issue in this claim construction.  The issue is not whether the claimed device can include more than one "housing forming an enclosure," or even whether the housing can contain components other than the jack means.  The issue is whether each individual "housing forming an enclosure" must include both the first and second jack means.  In other words, the issue is not how many housings are allowed, but whether each housing has to include both the first and second jack means.  RTI fails to rebut the plain meaning of its claim terms: that "*A* housing" contains or otherwise includes both the first and second jack means.

### C.  Jack Means

To avoid burdening the Court, Defendants withdraw their proposed construction and accept RTI's construction, because the issue has little, if any, consequence.  Defendants understand that RTI's construction is that "jack" has its common meaning (DI 84 at 10-12), and accepts the definition of "Jack" as cited in Newton's Telecom Dictionary:

> JACKS -- A receptacle used in conjunction with a plug to make electrical contact between communication circuits. Jacks and their associated plugs are used in a variety of connecting hardware applications including cross connects, interconnects, information outlets, and equipment connections. Jacks are used to connect cords or lines to telephone systems. A jack can be female or male.

(DI 84-5 at p. 4.)

### D.  Switch Means

"switch means operatively connected to said first jack means for disconnecting (as defined below) said first telephone from said network during routing of a telephone call from said first telephone"

- 17 -

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| This should not be governed by 35 U.S.C. § 112(f).<br><br>switch operatively connected to said first jack for disconnecting said first telephone from said network during routing of a telephone call from said first telephone<br><br>Even if construed under 35 U.S.C. § 112(f): Structure should be switch. | This is a means-plus-function element, whose construction is governed by 35 U.S.C. § 112(f).  The structure of the "switch means" is the "2 Form C switch," which must disconnect the calling telephone from the network during routing to prevent the dialed number from being sent to the central office as it is dialed and during the time when the calling telephone is disconnected from the network, substitute current must be supplied to the calling telephone through the switch means to power the calling telephone.  It is referenced in the Patent as item 36, and is described at Col. 3 lines 51-64, and Fig. 2. |

RTI argues that "switch means" is not a means-plus-function governed by § 112(f), because *MediaCom I and II* held that "switch" is sufficiently structural to a person skilled in the art.  (DI 84 at 12-13.)  RTI, however, ignores the fact that the *MediaCom* decision was issued in 1998—<u>eleven</u> years before the Reexamination of the '085 Patent resulted in a significantly different claim 1 being issued.  The amended claim 1 issued upon Reexamination governs here.

Moreover, RTI ignores the prosecution history of the Reexamination, which provides additional intrinsic evidence that applies in this claim construction.  During the Reexamination, RTI argued the exact opposite of what it argued in the *MediaCom* cases, and it is the Reexamination record that governs here.  Thus, even if the *MediaCom* decisions correctly ruled that a "switch means" was sufficiently structural, RTI is bound by its positions during the Reexamination, which significantly narrowed the definitions of the claim terms.

During the '085 Reexamination, RTI repeatedly stated that several of the limitations in claim 1 were means-plus-function elements governed by § 112(f), including "switch means." (A-264.)  As required by § 112(f), RTI identified the structure in the specification that

- 18 -

corresponded to the "switch means" means-plus-function element: "Ref. No. 36, Col. 3, lines 51-64, Fig. 2." (A-265, 266, 268, 269, 271, 273.)

Indeed, throughout the prosecution, RTI stated that the "switch means" had to be the structure shown in the specification (or an equivalent of that structure):

> The embodiment of the switch means element in the specification includes the "2 Form C" switch arrangement shown in Fig. 2 (block 36) of the patent. A "2 Form C" switch is also known in electrical engineering as a "double-pole, double-throw" switch. There are many configurations of switches--whether Form A, B, or C switches, shunting mechanisms, relays, or other mechanical or solid state devices--that could be easily substituted for the 2 Form C switch to accomplish the same function (disconnecting the originating telephone form the network), to get the same result (isolation of the originating telephone from the network during the period when the call is being routed).

(A-68.) In short, during the Reexamination, RTI: (i) expressly argued that § 112(f) applies; (ii) defined the structure in the specification that corresponded to the "switch means" means-plus-function element; and (iii) complied with the requirements of § 112(f) and stated that the "switch means" includes the structural equivalent of the disclosed "2 form C" structure.

RTI then relied on its § 112(f) construction of "switch means" in order to distinguish its invention from three separate prior art references. RTI argued that the prior art port cards did not have the <u>structure</u> corresponding to the "switch means" means-plus-function element:

> Those port cards may contain various conventional switches which perform different functions. However, the Examiner does not point to any particular element of [the prior art] disclosed on those pages that corresponds either <u>structurally or functionally</u> to the claimed "switch means".

(A-282; emphases supplied.)

Furthermore, even if "switch means" is not governed by § 112(f)—which it clearly is in

- 19 -

view of the prosecution history—RTI's construction would still fail.  RTI suggests that the "term

'switch' [i]s a class of structures that connect and disconnect communications between a

telephone and a network."  (DI 84 at 12).  This argument, however, is in direct conflict with the

position RTI previously presented to the PTO.  During the Reexamination, RTI specifically

argued to the Patent Office that its "switch means" was limited and did <u>not</u> cover "a class of

structures that connect and disconnect communications between a telephone and a network."

Thus, RTI distinguished the prior art on the grounds that the prior art switches that connected

and disconnected communications between a telephone and a network were different from the

claimed "switch means":

> Clearly, the [prior art] Vodavi system (as does any telephone system of this type) <u>includes many switches</u> (for example, the Normal/Service switch referred to in those pages) that provide a variety of functions.  <u>However, none of the switches disclosed in those pages of Vodavi are comparable to the claimed "switch means"</u> because none function to disconnect the telephone from the network and at the same time provide current to the telephone from a current generator, nor are they connected to other components in the system (telephone number detecting and storing means, and number sequence generating means) in the claimed manner.
>
> Further, the Examiner does not point to a single switch or combination of switches disclosed in those pages of Vodavi that <u>could be considered to meet the claim limitations directed to the switch means or the claim limitations reciting the manner in which the switch means is connected</u>.

(A-276; emphases supplied.)

RTI proceeded to argue that prior-art switches are <u>not</u> "switch means" because, *inter alia*,

the prior-art switches do not disconnect the telephones from the network:

> The Vodavi … Trunk Boards are peripheral boards which served to interface the Vodavi system with the telephone network….

- 20 -

> They function to select particular … trunk lines respectively for sending calls over the telephone network.
>
> No where in the Vodavi manual does it state that the … trunk selector boards, or any other Vodavi circuit, function to disconnect the Vodavi system from the network as a whole, that is, all of the telephone network trunk lines at one time.  That would require that the jacks that connect the trunk lines to the trunk selector boards be unplugged.
>
> Although the Vodavi manual does state that the … Trunk Boards have "disconnect supervision" that does not indicate that these boards disconnected the Vodavi system from the network.

(A-278; emphases supplied and internal citations omitted.)

RTI also explained that "switch means" does not include a circuit switch which merely changes the path through which a telephone signal is directed, but which is never disconnected:

> The Examiner also points to the Power Failure Transfer Circuit of Vodavi depicted at page 500-16 of the manual as being the claimed "switch means". That circuit contains a switch which functions to connect one of the Vodavi telephones to the telephone network. However, that switch connects that telephone to the network in either·state.  That is, it never disconnects the telephone from the network. It only changes the path through which the telephone is connected to the network.

(A-280-281).

All of the arguments RTI previously asserted during the Reexamination are directly contrary to the claim constructions RTI now proposes.  RTI has provided no explanation for its failure to adhere to its prior positions.  Again, RTI cannot rely on a certain construction in order to obtain a patent, and then rely on a conflicting construction to sue on it.

Defendants' proposed construction merely incorporates RTI's representations to the Patent Office during the Reexamination.  The "switch means" claim construction should be exactly what RTI argued it was in the Patent Office.

- 21 -

### E.  Disconnecting

"switch means operatively connected to said first jack means for <u>disconnecting</u> said first telephone from said network during routing of a telephone call from said first telephone"

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Should be ordinary meaning and in the context of the specification and prosecution history, disconnecting the communication such as signaling. | Interruption of the electrical circuit between the telephone and the network -- the breaking or opening -- of the electrical circuit between the telephone jack and the network. |

RTI's proposed construction of "disconnecting" faces two hurdles: (1) its proposed construction was already rejected once in *MediaCom II*; and (2) it is inconsistent with the prosecution history of claim 1.  As to the first point, in *Mediacom II,* RTI argued that "disconnecting" is "limited to the disabling of signaling between the telephone and the network, while the telephone remains electrically connected."  *MediaCom II*, 34 F. Supp. 2d. at 79.  The district court, however, rejected RTI's proposal, and construed the term "disconnecting" as meaning:

> to require the interruption -- the breaking or opening -- of the electrical circuit between the telephone jack and the network.

*Id.* at 81.  RTI does not explain why it ignores this prior judicial holding in making its present arguments to the Court.  (DI 84 at 13.)

Regardless of the previous *MediaCom* ruling, however, the '085 Patent subsequently went into Reexamination and was further clarified and limited.  During the Reexamination, RTI distinguished the switches included in the prior art systems because those switches did not <u>completely disconnect</u> the telephone from the network.  Thus, RTI argued:

> The call may be terminated, but the telephone remains connected to the network, even when no call is taking place.  A party can simply pick up the receiver of the telephone at any time to obtain a dial tone and make another call. Disconnecting the telephone from the

- 22 -

> network occurs when the telephone jack is pulled out of the wall
> receptacle such that the current to operate the telephone is cut off
> and no dial tone is available. That is not what the Vodavi trunk
> selector boards are doing.

(A-279.)  RTI then reiterated the need to completely disconnect in order to distinguish prior art:

> The Isoetec system … has a telephone interface port card that
> connects to the telephones and a network interface port card that
> connects to the telephone network.  …[T]he network interface of
> Isoetec <u>does not disconnect the system from the network as a
> whole</u>.

(A-282.)

Although the definition of "disconnecting" could be further narrowed, to avoid

unnecessary burden on the Court, Defendants have adopted the construction that was provided in

*MediaCom II*, 34 F. Supp. 2d at 81.  The construction is consistent with the prosecution history,

which mandates that the term "disconnecting" mean that the telephone must disconnect from the

network as a whole—i.e., that not even the phone dial tone can be communicated.

### F.  <u>Means operatively connected to said switch means for generating a current</u>

"<u>means operatively connected</u> to said switch means <u>for generating a current</u> through said switch
means to the first telephone corresponding to a current provided by said network, when the first
telephone is disconnected from said network by said switch means"

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| This should not be governed by 35 U.S.C. § 112(f). Current source operatively connected to said switch for generating a current through said switch to the first telephone corresponding to a current provided by said network, when the first telephone is disconnected from said network by said switch. Even if construed under 35 U.S.C. § 112(f): Structure should be current source. | *Amended*: This is a means-plus-function element, whose construction is governed by 35 U.S.C. § 112(f).  The structure of the "means" is the structure shown in the Figure 2 drawing as connecting item 38, as well as the structure of item 38. |

As was the case with the term "disconnecting," RTI's proposed construction of this term

- 23 -

faces two hurdles: (1) its proposed construction was already rejected once in the *MediaCom* case; and (2) it is inconsistent with the prosecution history.  As to the first point, in *MediaCom I*, RTI argued that the limitation was not governed by § 112(f).  The district court rejected RTI's proposal, and held that the

> Court construes the generating means element of the claim as a means-plus-function element because it describes no particular structure for performing the function of generating a current corresponding to a current provided by the network.

*MediaCom I*, 4 F. Supp. 2d at 28.  RTI does not explain why its present arguments to the Court directly contradict this prior judicial determination.  (DI 84 at 13-14.)

In any event, in the '085 Reexamination that followed *MediaCom I,* RTI confirmed that this term was a means-plus-function limitation governed by § 112(f), and repeatedly linked the "means" to a structure identified in the specification: "Ref. No. 38, Col. 3, lines 57-61, Col. 4, lines 22-27, Fig.2."  (A-265, 267, 268, 269, 271, 273.)  Defendants have simply adopted RTI's previous representations to the Patent Office, and propose that the Court utilize the construction that RTI previously asserted.  The record of RTI's representations in the Patent Office, which resulted in current claim 1 being issued, is the best evidence of the meaning of the term.

Although the parties do not appear to dispute the issue, it should be noted that the telephone attached to the "housing" must be powered by an electrical current that has to go through the same "switch means" as are used to disconnect the telephone from the network.  This is the plain language of the claim, and was a point RTI relied on in order to distinguish the prior art:

> While the Vodavi system does provide current to operate its telephones, that current is not provided to the telephones through either of the trunk selector boards …, which interface the Vodavi

- 24 -

system with the telephone network. … [Current in Vovadi] is not provided through any of the trunk selector boards that interface with the telephone network.

… Thus, Vodavi lacks "means . . . for generating current through said switch means to said first telephone" because the telephone interface boards do not act through the trunk selector boards of the network interface.

(A-279.)

### G.  Means … for detecting and storing said telephone number

"means operatively connected to said switch means for detecting and storing said telephone number originating from the first telephone"

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| This should not be governed by 35 U.S.C. § 112(f).<br>Detecting and storing logic (e.g., routine or subroutine) operatively connected to said switch for detecting and storing said telephone number originating from the first telephone<br><br>Even if construed under 35 U.S.C. § 112(f): Structure should be detecting and storing logic (e.g., routine or subroutine). | This is a means-plus-function element, whose construction is governed by 35 U.S.C. § 112(f).  The structure of the "means operatively connected to said switch means for detecting and storing said telephone number originating from the first telephone" is the combination of:<br>"the DTMF tone detector 88" for detecting a telephone number, and an unknown and indefinite structure for "storing said telephone number originating from the first telephone." |

During the Reexamination, RTI stated that the "means operatively connected to said switch means for detecting and storing said telephone number originating from the first telephone" was a means-plus-function element governed by § 112(f) and identified its structure as "Ref. No. 88, Col. 4, lines 40-43, Fig. 2."  (A-265, 267, 269.)  Defendants propose that the Court utilize the construction that RTI argued in the Patent Office.  Again, the record of RTI's representations in the Patent Office that resulted in the current claim 1 is the best evidence of the meaning of the term.

- 25 -

### H.  Means for addressing said database

"means for addressing said database means for identifying a plurality of communication switch paths to said second telephone and the cost rate of each path"

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| This should not be governed by 35 U.S.C. § 112(f).<br>Database addressing logic (e.g., routine or subroutine) for addressing said database means for identifying a plurality of communication switch paths to said second telephone and the cost rate of each path<br>Even if construed under 35 U.S.C. § 112(f): Structure should be database addressing logic (e.g., routine or subroutine). | This is a means-plus-function element, whose construction is governed by 35 U.S.C. § 112(f).  The structure of the "means for addressing said database means for identifying a plurality of communication switch paths to said second telephone and the cost rate of each path" is the algorithm at Col 6 lines 7-47 and Figure 5 of the Patent. |

During the Reexamination, RTI stated that the "means for addressing said database means for identifying a plurality of communication switch paths to said second telephone and the cost rate of each path" was a means-plus-function element governed by § 112(f) and identified its structure as "Ref. No. 50, Col. 6, lines 2-30, Fig. 5."  (A-265-267, 270.)  Defendants propose that the Court utilize the construction that RTI argued in the Patent Office.  Again, the record of RTI's representations in the Patent Office that resulted in the current claim 1 is the best evidence of the meaning of the term.

### I.  Means … for comparing the cost rate of each path

"means actuated subsequent to the detection of said telephone number originating from said first telephone for comparing the cost rate of each path so as to determine a least cost route"

- 26 -

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| This should not be governed by 35 U.S.C. § 112(f).<br><br>Comparing logic (e.g., routine or subroutine) actuated subsequent to the detection of said telephone number originating from said first telephone for comparing the cost rate of each path so as to determine a least cost route<br><br>Even if construed under 35 U.S.C. § 112(f): Structure should be comparing logic (e.g., routine or subroutine).<br><br>The term is not indefinite. | This is a means-plus-function element, whose construction is governed by 35 U.S.C. § 112(f).  The element "means actuated subsequent to the detection of said telephone number originating from said first telephone for comparing the cost rate of each path so as to determine a least cost route" is not described in the specification and, therefore, this claim term is indefinite. |

During the Reexamination, RTI stated that the "means actuated subsequent to the detection of said telephone number originating from said first telephone for comparing the cost rate of each path so as to determine a least cost route" was a means-plus-function element governed by § 112(f) and identified its structure as "Ref. No. 50, Col. 2, lines 10 and 11, Col. 4, lines 1-16, Col. 6, lines 22-28, Figs. 2 and 5."  (A-265-266.)  Defendants challenge RTI's claim, because the sections cited by RTI do not provide any structure.  Because there is no structure, the claim term is indefinite.

Alternately, the limitation should be defined in accordance with RTI's statements in the Patent Office—i.e., the limitation is a means-plus-function element governed by § 112(f) with a corresponding structure identified as "Ref. No. 50, Col. 2, lines 10 and 11, Col. 4, lines 1-16, Col. 6, lines 22-28, Figs. 2 and 5."  (A-265-266.)  Thus, Defendants alternately propose that the Court utilize the construction that RTI argued in the Patent Office.  Again, the record of RTI's representations in the Patent Office that resulted in the current claim 1 is the best evidence of the meaning of the term.

- 27 -

In its brief, RTI argues that the § 112(f) structure of this element is anything within "a class of logic operations (i.e., structure) that compare multiple inputs." This is legal nonsense, because it eviscerates the entire purpose of § 112(f); a "structure" would become nothing more than a functional statement.

Moreover, RTI's position is untenable because it contradicts RTI's arguments during Reexamination. RTI distinguished the prior art on the basis that the prior art allegedly dealt with what RTI called "ARS"—a more primitive form of least-cost-routing, but one that still utilized "a class of logic operations (i.e., structure) that compare multiple inputs." Thus, RTI essentially proposes a construction that it previously argued should not be used during the Reexamination (because it would have made RTI's patent similar to the prior art).

RTI previously argued to the PTO that ARS determined a least-cost route based on a logic of multiple inputs, but just did it in a more primitive fashion than the claimed "means":

> Upon making a call, an ARS system looks at the dialed number and then simply selects the route based on the dialed number in the order of predetermined priorities previously stored in the route tables for the time of day and day of week (after undesirable routes are eliminated, for example, because of lack of capacity, insufficient transmission speed or other technical deficiency). …
>
> … Further, the information from LCR tables is used by the telephone system in a different manner than that obtained from the ARS route tables. In LCR, the stored information is compared to select a route. In ARS, the route is selected based upon the stored route priorities.

(A-291.) In its appellate brief, RTI argued the ability to compare multiple inputs alone was not sufficient to make RTI's patent anticipated by the prior art:

> Neither the Vodavi system, the Isoetec system nor the Jabs system has means for comparing cost rates to determine a least cost route because they are all ARS systems which are not capable of

- 28 -

comparing the cost rates to determine a route. Those systems can only select a route from the appropriate hierarchy table.

Accordingly, because each of the references lack "means for comparing the cost rate of each path so as to determine a least cost route," claims 1-5, 7-10 and 13 cannot be anticipated. . . .

(A-305-306). RTI and its "expert" do not address these issues, and provide no explanation of how or why their arguments are consistent with the prosecution history.

Thus, the claim limitation should be held to be indefinite for lacking structure. In the alternative, if it is not indefinite, the limitation must be construed as a means-plus-function element governed by § 112(f) with the structure previously identified by RTI in the PTO.

### J.  Means … for generating a number sequence

"means operatively connected to said switch means and said second jack means for generating a number sequence corresponding to a desired carrier so that said call is routed through said second jack means to the selected communication path and carrier to establish a switched connection between said first telephone and said second telephone phone"

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| logic (e.g., routine or subroutine) operatively connected to said switch and said second jack for generating a number sequence corresponding to a desired carrier so that said call is routed through said second jack to the selected communication path and carrier to establish a switched connection between said first telephone and said second telephone phone<br><br>Even if construed under 35 U.S.C. § 112(f): Structure should be logic (e.g., routine or subroutine) having operations that generate a number sequence that corresponds to a desired carrier. | *Amended*:<br><br>This is a means-plus-function element, whose construction is governed by 35 U.S.C. § 112(f). The structure is Ref. No. 80, Col. 2, lines 11-18, Col. 4, lines 33-38, Col. 6, lines 26-28, Figs. 2, 4 and 5. |

During the Reexamination, RTI stated that the "means … for generating a number sequence" was a means-plus-function element governed by § 112(f), and identified its structure

- 29 -

as "Ref. No. 80, Col. 2, lines 11-18, Col. 4, lines 33-38, Col. 6, lines 26-28, Figs. 2, 4 and 5."

(A-266.)  In order to avoid needless burden on the Court, Defendants have amended their

proposed construction to simply adopt RTI's prior representations to the Patent Office.

     In contrast, RTI's argument cannot be considered, because it fails to even address the

prosecution history of the patent.  Thus, RTI's proposed construction lacks support in the

intrinsic record.

**IV.**    **CLAIM CONSTRUCTIONS -- PATENT 5,519,769**

    **A.  General Overview of Patent 5,519,769**

     The '769 Patent also went through a Reexamination, but a far simpler one.  In arguing for

patentability, RTI summarized the invention Patent 5,519,769 as follows:

> One of the features of the patented invention is that the call rating
> device transmits to the rate provider the time and date of the last
> update of its billing rate parameters along with its identification
> information.  The rate provider, based on the information received
> from the call rating device, verifies if the billing rate parameters of
> the call rating device should be updated.   If the rate provider
> determines that an update is required, same is transmitted to the
> call rating device.

(A-405.)  RTI also noted that its invention only covers methods where the rate provider sends an

update if the information from the call rating device indicates that an update is required:

> [T]he Examiner's assessment of the teachings of [prior art] Azar
> fails to recognize other significant differences between Azar and
> the claimed invention.  These include the fact that Azar's main
> system computer does not transmit updated billing rate parameters
> only "when the rate provider determines that an update is required"
> as specified in the claims.  … The update [in the prior art Azar]
> occurs automatically each time access to the central computer is
> granted, whether or not it is required.

(A-405-406.)  These are RTI's own definitions of the invention of the '769 Patent, and are useful

- 30 -

guidelines for any construction of the claims.

In reviewing RTI's brief, it was noted that some disagreements between the parties were not sufficiently material. Thus, to avoid burdening the Court, Defendants have in some cases simply accepted RTI's proposed construction, and have restated RTI's construction as an "Agreed Construction." The fact remains that Defendants have already demonstrated to RTI that they do not practice the key elements of the '769 Patent—including the undisputed elements.

### B.  At a predetermined time and date

In the parties' Joint Claim Chart filed with the Court, RTI construed the term as "at a predetermined time and date determined substantially in advance of the call." (DI 70 at 12.) Yet, in its brief, without addressing any change in position, RTI now asserts that "the ordinary meaning of the claim language is clear" and that "this Court should, as does the artisan, construe the phrase as a predetermined time and date." (DI 84 at 18-19.)

What RTI fails to disclose is that its initial construction conformed with the definition adopted by the district court in *MediaCom I*, and its new construction was the one rejected by the court. *See Mediacom I*, 4 F. Supp. 2d at 32 ("Claims 1 and 11 therefore encompass a method in which the time and date for calling the rate provider are selected a substantial period in advance of the call"). Defendants incorporate by reference Judge Young's analysis in *MediaCom I* in support of its construction.

Moreover, after the *MediaCom I* decision, the '769 Patent went through a Reexamination, which compelled RTI to narrow the definition of the term. During the '769 Reexamination, RTI distinguished the prior art on the basis that its "predetermined time and date" was not sufficiently "predetermined." Thus, RTI specifically argued that merely connecting at regular intervals, as

- 31 -

opposed to connecting at a predetermined specific date and a specific time, is not included in the claim:

> It is also noted that [the prior art] fails to meet the claim language because it does not teach that the call rating device connects to the rate provider "at a predetermined time and date." [The prior art] teaches… only that the internal clock triggers the processor "at given time intervals." Programming the system to update at selected time intervals (e.g. once a week) is not the same as programming it to update at a particular date and time (e.g., May 4, 2001 at 8:45a.m.).

(A-406.)

The arguments of RTI and its "expert," which obviously ignore the prior judicial review and the prosecution history of the term, are entitled to no weight, and should be disregarded. Certainly, RTI should explain why it ignores prior judicial holdings against it and the prosecution history before arguing for a conflicting construction.

The proper construction is the one stated by Defendants: "The time and date for calling the rate provider are selected a substantial period in advance of the call." This is the same construction previously adopted by the district court in *MediaCom I*, and is consistent with the subsequent prosecution history of the Reexamination.

### C.  A data transfer line

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| a data transfer line (a communication line or path to transfer data) | A wire operatively connected to a modem associated with a call rating device on one end and a phone network on the other. |

Defendants' construction merely specifies what is already in the claim language. The claim requires that the data transfer line must connect "the call rating device to a rate provider." Although this is already in the claim, Defendants propose a complete construction so that there is

- 32 -

no opportunity for confusion.

### D.  Call rating device

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| This should not be governed by 35 U.S.C. § 112(f).<br><br>Call rating device | This is a means-plus-function element, whose construction is governed by 35 U.S.C. § 112(f).  But, whether or not a means-plus-function element, the term means an identifiable physical component having the function of receiving rate information from a rate provider over a data transfer line, incorporating the rate information and thereafter managing calls over the least cost routing route. |

RTI and its "expert" simply assert that "[t]he artisan understands the phrase 'call rating device,' as used in the specification, describes a device that rates calls."  (DI 84 at 19)  That just begs the question: what is "a device that rates calls"?  Certainly, a skilled artisan at the time RTI filed its patent application could not know, because, according to RTI, a "device that rates calls" did not exist at that time.  RTI fails to explain how a skilled artisan would know what "a device that rates calls" was at the time RTI filed its patent application if no such device existed.

### E.  Transmitting over the data transfer line

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| transmitting over the data transfer line | Conveying information over the same wire operatively connected to a call rating device on one end and a phone network on the other. |

Claim 1 clearly identifies "a data transfer line" between "the call rating device [and] a rate provider."  Thereafter, claim 1 requires

> transmitting over the data transfer line indicia identifying the call rating device and the date and time of the last update of the billing rate parameters,

- 33 -

The statement "the data transfer line" requires, as a matter of law, that the transmitting take place over the "the data transfer line," which is the line that connects "the call rating device [and] a rate provider." That is the proper interpretation of the claim. Although it should be clear and undisputed, it is worth including in the claim construction to make sure that the jury understands and appreciates the meaning of the term. On the other hand, RTI's proposed construction is unlimited by the terms of the claims, and can mislead the jury into believing that information can be communicated via a data transfer line that is different than the earlier-defined line.

### F. Indicia

| Agreed Construction |
| --- |
| indicia identifying the call rating device and the date and time of the last update of the billing rate parameters |

### G. Verifying

"verifying if billing rate parameters should be updated"

| Plaintiff's Construction | Defendants' Construction |
| --- | --- |
| verifying if billing rate parameters should be updated | The rate provider, based on the information received from the call rating device, verifies if the billing rate parameters of the call rating device should be updated. If the rate provider determines that an update is required, same is transmitted to the call rating device. |

The only issue here is that, based on the structure of the claim, the "verifying" must be done by the rate provider and not the call-rating device. The limitation "verifying if billing rate parameters should be updated" is squeezed between the limitations of "connecting" to the rate provider and "transmitting," and therefore clarifies that the verifying has to take place at the rate provider.

- 34 -

### H.  <u>Transmitting</u>

"transmitting from the rate provider to the call rating device"

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| transmitting from the rate provider to the call rating device | The rate provider, based on the information received from the call rating device, transmits the billing rate parameters to the call rating device. |

Similar to the issue above, Defendants' construction merely clarifies that the rate provider does the transmitting.

- 35 -

## V.    <u>CONCLUSION</u>

Defendants respectfully request that the Court enter the claim constructions as proposed

by Defendants in this brief.

Respectfully submitted,

Dated: New York, New York
October 22, 2013

By:*/s/ George Pazuniak*
George Pazuniak
O'Kelly Ernst & Bielli, LLC
901 N. Market St.
Suite 1000
Wilmington, DE 19801
Tel: 302-478-4230
Fax: 302-295-2873
GP@del-iplaw.com

Alex Gertsburg
The Gertsburg Law Firm
36 South Franklin St.
Chagrin Falls, OH 44022
(440) 571-7775
ag@gertsburglaw.com

Keith D. Nowak
Andriy R. Pazuniak
Carter Ledyard & Milburn LLP
2 Wall Street
New York, New York 10005
(212) 732-3200
nowak@clm.com
pazuniak@clm.com

*Attorneys for Defendants*
*Broadvox Holding Company, LLC and*
*Cypress Communications Operating*
*Company, LLC*

- 36 -

7302061.2