Milton Springut
Tal S. Benschar
Scott Spencer
Springut Law PC
75 Rockefeller Plaza — 19th floor
New York, New York 10019
(212) 813 1600

*Counsel for Plaintiff Rates Technology Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RATES TECHNOLOGY INC.,<br><br>Plaintiff,<br><br>v.<br><br>BROADVOX HOLDING COMPANY, LLC, CYPRESS COMMUNICATIONS OPERATING COMPANY, LLC and ABC COMPANIES 1 to 10,<br><br>Defendants. | CIVIL ACTION<br><br>NO. 13-152 (SAS)(SN) |

**PLAINTIFF RATES TECHNOLOGY INC.'S**
**REPLY CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I. PROCEDURAL ISSUES IMPACTING CLAIM CONSTRUCTION ........ 1

II. DEFENDANTS' FUNDAMENTAL ERRORS IN CONSTRUING CLAIMS ........ 3

A. Claims Must *Always* Be Construed As Does a Person Having Ordinarily Skill in the Art ........ 5

1. Even Cases Cited by Defendants Consider Expert Testimony for the Artisan's Viewpoint ........ 5

2. Rationale for Requiring Artisan's Viewpoint ........ 7

B. Controlling Law Precludes Defendants' Reasons for Ignoring the Artisan's Viewpoint ........ 8

1. *Mediacom*, Although Lacking Final Judgment, Highlights the Need for an Expert ........ 9

2. The Artisan's Viewpoint Always Controls the Trigger to Section 112(f) ........ 10

3. "Means," Merely a Starting Point, Does Not Replace the Artisan's Viewpoint ........ 11

4. Prosecution History Statements Are Irrelevant to *Whether* Section 112(f) Applies ........ 12

5. An Ambiguous Prosecution History, Even If Considered, Does Not Trigger Section 112(f) ........ 12

C. Under Section 112(f), this Ambiguous Prosecution History Does Not Inform How Much Structure the Artisan Requires ........ 16

D. Classes of Logic Known to the Artisan and Described in the Claims and Specification are Structure ........ 16

III. DEFENDANTS' ERRORS REGARDING SPECIFIC CONSTRUCTIONS ........ 18

A. Construction of Disputed Terms in Claim 1 of the '085 Patent ........ 18

1. device ........ 18

2. comprising ........ 18

3. a housing forming an enclosure and comprising ........ 19

4. first jack means for connection to said first telephone; second jack means for connection to said network ........ 21

5. switch means operatively connected to said first jack means for disconnecting said first telephone from said network during routing of a telephone call from said first telephone ........ 22

6. disconnecting ........ 25

7. means operatively connected to said switch means for generating a current through said switch means to the first telephone corresponding to a current provided by said network, when the first telephone is disconnected from said network by said switch means ........ 27

8. means operatively connected to said switch means for detecting and storing said telephone number originating from the first telephone ........ 28

9. means for addressing said database means for identifying a plurality of communication switch paths to said second telephone and the cost rate of each path ........ 28

10. means actuated subsequent to the detection of said telephone number originating from said first telephone for comparing the cost rate of each path so as to determine a least cost route ........ 28

11. means operatively connected to said switch means and said second jack means for generating a number sequence corresponding to a desired carrier so that said call is routed through said second jack means to the selected communication path and carrier to establish a switched connection between said first telephone and said second telephone phone ........ 28

    a. Reply Argument Specific To Certin Terms ........ 30

    b. Term No. 7 ........ 30

    c. Term No. 10 ........ 30

12. means for generating a current ........ 32

B. Construction of Disputed Terms in Claim 1 of the '769 Patent ........ 33

1. at a predetermined time and date ........ 33

2. a data transfer line ........ 34

3. call rating device ........ 35

4. transmitting over the data transfer line ........ 37

5. indicia identifying the call rating device and the date and time of the last update of the billing rate parameters ........ 38

6. verifying if billing rate parameters should be updated ........ 39

7. transmitting from the rate provider to the call rating device ........ 39

CONCLUSION ........ 40

# TABLE OF AUTHORITIES

**CASES**

*01 Communique Lab., Inc. v. LogMeIn, Inc.*,
687 F.3d 1292 (Fed. Cir. 2012) .......... 13, 19, 38

*3M Innovative Properties Co. v. Louis M. Gerson Co., Inc.*,
2010 WL 4106712 (D. Minn. 2010) .......... 22, 30, 33

*3M Innovative Properties Co. v. Tredegar Corp.*,
725 F.3d 1315 (Fed. Cir. 2013) .......... 8, 13

*3M Innovative Props. Co. v. Avery Dennison Corp.*,
350 F.3d 1365 (Fed.Cir.2003) .......... 25

*Accent Packaging Inc. v. Leggett & Platt Inc.*,
707 F.3d 1318 (Fed. Cir. 2013) .......... 19

*AFG Indus., Inc. v. Cardinal IG Co., Inc.*,
239 F.3d 1239 (Fed. Cir. 2001) .......... 8

*Am. Acad. Of Sci. Tech Ctr.*, *In re*,
367 F.3d 1359 (Fed. Cir. 2004) .......... 15

*Apex Inc. v. Raritan Computer, Inc.*,
325 F.3d 1364 (Fed. Cir. 2003) .......... 11, 17

*Aristocrat Technologies Australia Pty Ltd. v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008) .......... 17

*Atmel Corp. v. Info. Storage Devices*,
198 F.3d 1374 (Fed. Cir. 1999) .......... 10, 16

*Aventis Pharm. Inc. v. Amino Chemicals Ltd.*,
715 F.3d 1363 (Fed. Cir. 2013) .......... 5, 6

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
512 F.3d 1338 (Fed. Cir. 2008) .......... 19, 38

*BASF Agro v. Makhteshim Agan of North America*,
519 Fed.Appx. 1008 (Fed. Cir. Mar. 20, 2013) .......... 6

*Cambridge Prods. Ltd. v. Penn Nutrients, Inc.*,
962 F.2d 1048 (Fed. Cir. 1992) .......... 2

*Cole v. Kimberly-Clark Corp.*,
102 F.3d 524 (Fed. Cir. 1996) .......... 11

*Computer Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1366 (Fed. Cir. 2008) .................................................................. 27, 29

*Creo Products, Inc. v. Presstek, Inc.*,
305 F.3d 1337 (Fed. Cir. 2002) ........................................................................ 10

*Elbex Video, Ltd. v. Sensormatic Electronics Corp.*,
508 F.3d 1366 (Fed. Cir. 2007) ........................................................................ 13

*Flo Healthcare Solutions, LLC v. Kappos*,
697 F.3d 1367 (Fed. Cir. 2012) .................................................................. 12, 36

*Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*,
423 F.3d 1343 (Fed. Cir. 2005) .................................................................. 19, 38

*Grober v. Mako Products, Inc.*,
686 F.3d 1335 (Fed. Cir. 2012) .................................................................. 27, 29

*Hoffman-La Roche Inc. v. Invamed Inc.*,
213 F.3d 1359 (Fed. Cir. 2000) .......................................................................... 2

*Kara Tech. Inc. v. Stamps.com Inc.*,
582 F.3d 1341 (Fed. Cir. 2009) .......................................................................... 7

*Lava Trading, Inc. v. Sonic Trading Mgmt.*, LLC,
445 F.3d 1348 (Fed. Cir. 2006) ...................................................................... 2, 9

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
382 F.3d 1354 (Fed.Cir. 2004) ........................................................................ 36

*Mediacom Corp. v. Rates Tech., Inc.*,
4 F.Supp.2d 17 (D. Mass. 1998) ........................................................ 9, 10, 33, 39

*MediaCom v. Rates Tech., Inc.*,
34 F.Supp.2d 76 (D. Mass. 1998) ...................................................................... 9

*Mediacom v. Rates Tech., Inc.*,
No. 1:97cv10559, Dkt. No. 98 (D. Mass. March 22, 1999) .......................................... 9

*Motorola, Inc. v. VTech Commc'ns, Inc.*,
2009 WL 2026317 (D.Minn. July 6, 2009) ........................................................ 22

*Netcraft Corp. v. eBay, Inc.*,
549 F.3d 1394 (Fed.Cir.2008) .......................................................................... 13

*Paragon Solutions, LLC v. Timex Corp.*,
566 F.3d 1075 (Fed. Cir. 2009) ........................................................................ 19

*Pfizer, Inc. v. Teva Pharm., USA, Inc.*,
429 F.3d 1364 (Fed. Cir. 2005) .......... 9

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .......... 7, 8, 13, 20

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
711 F.3d 1348 (Fed. Cir. 2013) .......... 10, 12

*RF Delaware, Inc. v. Pac. Keystone Technologies, Inc.*,
326 F.3d 1255 (Fed. Cir. 2003) .......... 9, 35

*Robinson v. Cannondale Corp.*,
81 Fed.Appx. 725, 2003 WL 22839336 (Fed. Cir. Nov. 26, 2003) .......... 12

*Rodime PLC v. Seagate Tech., Inc.*,
174 F.3d 1294 (Fed. Cir. 1999) .......... 11, 36

*SAP America, Inc. v. Versata Dev. Grp.*,
107 U.S.P.Q.2d 1097, 2013 WL 3167735 (Patent Tr. & App. Bd. June 11, 2013) .......... 15

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
329 F.3d 823 (Fed.Cir.2003) .......... 25

*Swanson, In re*,
540 F.3d 1368 (Fed. Cir. 2008) .......... 15

*Terlep v. Brinkmann Corp.*,
418 F.3d 1379 (Fed. Cir. 2005) .......... 29

*Typhoon Touch Technologies, Inc. v. Dell, Inc.*,
659 F. 3d 1376 (Fed. Cir. 2011) .......... 10, 16, 17

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed.Cir.1997) .......... 21, 29, 30, 33

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
442 F.3d 1322 (Fed. Cir. 2006) .......... 2

*Y2 Associates v. Phone-Mate, Inc.*,
837 F.2d 1097 (Fed. Cir. 1987) .......... 15

**STATUTES**

35 U.S.C. § 112(f) .......... passim

Plaintiff Rates Technology Inc. ("RTI"), in accordance with Local Patent Rule 12, replies in further support of its principal claim construction brief. (Dkt. No. 84, RTI's Br.)[1]

## I. PROCEDURAL ISSUES IMPACTING CLAIM CONSTRUCTION

Defendants' submission reinforces RTI's position that claim construction at this juncture is premature because RTI has not been given discovery as to the accused system, and hence any claim construction lacks sufficient context. In their Answering Brief, Defendants amend several of their proposed constructions. (Compare *e.g.*, Dkt. No. 93, Def. Br. 15, 23, 29 with Dkt. No. 70, Joint Claim Terms Chart) Defendants' shifting positions reflect, just as RTI has previously explained, that claim construction at this stage is premature because it is an abstract exercise, wholly removed from the context of the issues of the case.

By way of background, the patents-in-suit concern the routing of calls according to cost: least-cost routing. Defendants' accused system is not publicly available for inspection. Prior to suit RTI asked for a confidential disclosure needed to assess whether there has been patent infringement, but was rebuffed. Because RTI could not otherwise obtain the information needed to fully assess infringement, RTI filed its complaint and therein notified the Court that it required discovery, just as provided by Rule 11(b)(3) and Federal Circuit precedent, *Hoffman-La Roche Inc. v. Invamed Inc.*, 213 F.3d 1359, 1364

[1] Defendants' attempt to transform its claim construction brief into a brief supportive of a Rule 11 claim, based on yet a third and new theory, is inappropriate and should be struck. (Def. Br. 2-3) As such, RTI is not responding directly to Defendants' new Rule 11 argument herein, unsupported and premature as it is.

(Fed. Cir. 2000) and *Cambridge Prods. Ltd. v. Penn Nutrients, Inc.*, 962 F.2d 1048, 1050 (Fed. Cir. 1992). (Dkt. No. 26)

The minimal discovery produced has failed to provide *any* meaningful disclosure of Defendants' system.[2] RTI (and hence the Court) is simply in the dark about the details of Defendants' least cost routing system. At this juncture, there is simply no way for RTI or this Court to know what aspects of any portion of the claim may ultimately be in dispute.

Where the accused product is a known item prior to suit, early claim construction promotes efficiency. But where an accused system operates in secrecy, any claim construction before meaningful discovery results in inefficiency and errors. "Without knowledge of the accused products" — as here — the court "lacks a proper context for an accurate claim construction." *Lava Trading, Inc. v. Sonic Trading Mgmt*., LLC, 445 F.3d 1348, 1350 (Fed. Cir. 2006); *see Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1330 (Fed. Cir. 2006) ("[T]he legal function of giving meaning to claim terms *always* takes place in the context of a specific accused infringing device or

---

[2] About 5 months into this lawsuit, Defendants stated, for the first time, that they used some secret, custom solution called "Pulse Voice." (Dkt. No. 52) But RTI's ability to discover the details of this system have been stymied by Defendants' production and several rulings of the Court. Because Defendants' Rule 12(b)(6) motion to dismiss was pending until November 1, 2013, under the Pilot Rules, made applicable to this case, neither depositions nor interrogatories could be taken. RTI twice asked the Court for an exception to this rule, and was twice denied.

Furthermore, Magistrate Judge Netburn limited discovery to only the "Pulse Voice" related documents. That production was misleadingly voluminous. It simply failed to shed any light on the details of Defendants' system. As RTI wrote to Judge Netburn, it needs deposition discovery to ascertain the details of the system and whether there are additional documents that Defendants have failed to produce.

Under the Scheduling Order, fact discovery ended on November 1, 2013. RTI will request that this period be extended and that it be allowed to conduct discovery (including deposition discovery) to learn the details of Defendants' system.

process." Vacating and remanding claim construction as "the record . . . contains no description of the accused infringing devices," the "court cannot fully and confidently review . . . claim construction . . .")(emphasis added).

For these reasons, RTI submits that claim construction should be deferred until RTI is provided with sufficient discovery to understand the operation of Defendants' accused system. RTI reserves the right to resolve additional and continuing issues of claim construction after it has obtained requested discovery directed to the accused systems if the Court disagrees and proceeds with a construction.

## II. DEFENDANTS' FUNDAMENTAL ERRORS IN CONSTRUING CLAIMS

As Defendants recognize, "RTI devotes a significant portion of its [opening claim construction] brief to arguing that claims are construed as would a skilled artisan." (Def. Br. 3) In RTI's opening brief, the meaning of each disputed claim language is explained from the viewpoint of a person having ordinary skill in the art, who has studied the entire record, including the claims, the specification, and the history. For this viewpoint, RTI relied upon the expert declaration of Mr. Bradley Walton, a degreed electrical engineer who — at the time of these inventions and thereafter — worked in the field of these inventions. (Walton 2-6, Exh. A)[3]

Defendants complain that Mr. Walton — the only expert of record — provided conclusions "without any analysis or reference to prior art" (Def Br. 12), which is

[3] References to the expert declaration of Bradley Walton will be to the declarant's surname followed by the cited paragraph of the declaration. References to selected excerpts of the prosecution history attached as an appendix to Defendants' Answering Brief will be by the term "A-" followed by page number. The entire prosecution history is available on the Patent Office website.

puzzling because Mr. Walton's declaration is chock full of both. The patents-in-suit were both filed in the mid-1990s. In providing examples of each of the classes of structures available at the time of invention that a person having ordinary skill in the art would understand as is described in both the claims and specifications, Mr. Walton specifically cited both the prior art, including classes of structure he *actually used at that time*, and references describing the prior art, see Walton exhibits:

B. American Heritage Dictionary Third Edition (1994)
D. Newton's Telecom Dictionary (1994)
E. Wikipedia, *Current Source*
F. Current Sources & Voltage References by Linden Harrison (2005)
G. Rogue Wave Standard C++ Library (Walton used; available in 1994)
H. Wikipedia, *SQL*
I. DBTools.h: a standard C++ Library (Walton used; available in 1994)

(Walton *passim*) Defendants, leaving unchallenged all the facts and opinions offered by Mr. Walton, concede by silence his expert understanding as to the knowledge of a person having ordinary skill in the art. Instead, Defendants wholly ignore the required viewpoint and evidence thereof, and invite this Court to do the same: "RTI is wrong to rely on any expert, because this approach conflicts with the law," (Def. Br. 6), and the requirement to construe claims "as would a skilled artisan . . . does not apply when cases are governed by 35 U.S.C. § 112(f), or when the prosecution history mandates a different construction." (Def. Br. 3) But, the opposite holds, as even the cases cited by Defendants explain.

### A. Claims Must *Always* Be Construed As Does a Person Having Ordinarily Skill in the Art

#### 1. Even Cases Cited by Defendants Consider Expert Testimony for the Artisan's Viewpoint

The three cases Defendants cite for the proposition that the Court should ignore evidence of the artisan's viewpoint when construing claims are, in fact, to the contrary.

Defendants' argument leads with a block quote from *Aventis Pharm. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363 (Fed. Cir. 2013), as if taken from its holding. (Def. Br. 6-7) Defendants' lack of a pinpoint citation (also known as a "jump-cite") was apparently intended to obscure the fact that Defendants' quotation actually comes ***from the dissent***![4]

The majority opinion in *Aventis* makes clear that claim construction analysis always depends upon the viewpoint of a person having ordinary skill in the art. *Id.* at 1376 (holding that terms are "construed in light of a person of ordinary skill in the art," and explaining the district court's "flawed analysis again does not consider the appropriate frame of reference for claim construction. A person of ordinary skill in the art . . .") Following its mandate, the *Aventis* court relied heavily on expert evidence of the viewpoint of a person having ordinary skill in the art in construing claims, *e.g.*:

> ***a person of ordinary skill in the art would recognize*** that an intermediate of the claimed chemical reaction would not be required to have the same purity as the end product.
>
> * * *
>
> Appellees maintain that no such clear and express support is found in the ′703 patent specification at issue. But ***this ignores that we must always construe the specification in light of the knowledge of one of ordinary skill in the art***. [citation omitted]. Through basic knowledge of chemical reactions and purification schemes, ***a skilled artisan would***

[4] Notwithstanding, even the dissent *considered* the expert testimony.

> ***recognize*** that the purity of an intermediate compound in a reaction is often not equivalent to the purity of the end product, especially when further, common physical purification steps may be necessary. ***Interpreting this specification in light of the knowledge of a person of ordinary skill in the art***, we hold that a proper construction requires different interpretations of "substantially pure" when applied to the CPK intermediate and piperidine derivative end product.
>
> * * *
>
> This flawed analysis again does not consider the appropriate frame of reference for claim construction. ***A person of ordinary skill in the art would recognize*** that the ′703 patent improved the regioisomeric purity of the end product that results from the claimed reaction as compared to the Friedel–Crafts acylation disclosed in the ′129 patent.
>
> * * *
>
> We hold that the modifier "substantially pure," ***when construed in light of a person of ordinary skill in the art*** and in view of the claimed improvements over the prior art, only applies regioisomeric impurities, not all impurities.

*Id.* at 1374-76.[5]

Similarly, in *BASF Agro v. Makhteshim Agan of North America*, the court recognized that "a court may consider extrinsic evidence, including expert testimony." 519 Fed.Appx. 1008, 1015 (Fed. Cir. Mar. 20, 2013). And it did, but unremarkably, because the expert misread the prior art, the court gave that testimony little weight.[6]

The third (and final) case cited by Defendants *considered* testimony from both of the "dueling experts," and ultimately construed the claims as did the expert whose

---

[5] The court relied upon evidence originating from expert testimony. (Compare *e.g.*, Corrected Joint Brief for Plaintiffs-Appellants, 2011 WL 3281833, *34-35 (July 14, 2011) (Fed. Cir. Case No. 2011-1334, Dkt. No. 48), *Aventis,* 715 F.3d 1363.

[6] Specifically, the expert explained that the "prior art required treatment both around *and* under a building." Yet that prior art actually taught "treatments applied around *but not* under a building." *Id*. at 1018 (emphasis in original).

testimony most closely aligned with the plain language of the claim. *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009). Here, unlike in *Kara*, no dueling testimonies exist — Mr. Walton's expert testimony is unchallenged.

Thus, none of Defendants' cited cases support the proposition that the law prohibits consideration of expert evidence. Rather, in each of these cases, the court considered and relied on expert testimony, and the law is clear that this Court needs to consider Mr. Walton's expert and unchallenged declaration because, as explained below, patents are addressed to those skilled in the art.

### 2. Rationale for Requiring Artisan's Viewpoint

Claims and the remaining "descriptions in patents are not addressed to the public generally, to lawyers or to judges, but, as Section 112 says, to those skilled in the art to which the invention pertains or with which is most nearly connected." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). Further,

> [b]ecause the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." Those sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."

*Id*. at 1314 (citations omitted). Claims, specifications, and the prosecution history — which largely contains the correspondence between applicants and patent examiners specialized in the particular field of the invention — are drafted for a person having ordinary skill in the art to make and use the invention without undue experimentation. In the *en banc* Federal Circuit's words, "the ***foundation*** for . . . claim construction

determinations is 'the level of ordinary skill in the pertinent art.'" *Id.* at 1333 (emphasis added). Evidence of "what a skilled artisan reading the claim would understand the limitation to mean" is so important that courts elevate the artisan's viewpoint, idiosyncratic as it may be, above the application of grammatical guides such as the "Chicago Manual of Style." *3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1327 (Fed. Cir. 2013).

Indeed, to ignore the viewpoint of a person having ordinary skill in the art, as Defendants do, is reversible error. *AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239, 1249 (Fed. Cir. 2001) (remanding for failing to use expert testimony of artisans in construing claims: "extrinsic evidence can and should be used to inform a court's claim construction, and [the] failure to take into account the testimony of persons having ordinary skill in the art may constitute reversible error").

### B. Controlling Law Precludes Defendants' Reasons for Ignoring the Artisan's Viewpoint

Ignoring the viewpoint of a person having ordinary skill in the art, Defendants contend that (1) *Mediacom* "expressly rejected" the only viewpoint of record (Def. Br. 2), (2) use of the word "means" and citations in the prosecution history both trigger 35 U.S.C. § 112(f) (Def. Br. 8-9), and (3) all language within these citations must be imported into the claims. Finally, Defendants contend that logic known to a person having ordinary skill in the art cannot provide structure necessary to prevent purely functional claiming. (Def. Br. 12-13) Each contention is wrong.

### 1. *Mediacom*, Although Lacking Final Judgment, Highlights the Need for an Expert

Defendants argue that claim constructions proposed by RTI and its expert were "expressly rejected" by "two separate decisions," citing *Mediacom Corp. v. Rates Tech., Inc.*, 4 F.Supp.2d 17 (D. Mass. 1998) and *MediaCom Corp. v. Rates Tech., Inc.*, 34 F.Supp.2d 76, 79 (D. Mass. 1998). (Def. Br. 2, 8) The "two separate decisions" are just two interlocutory opinions rendered in the same case which never went to final judgment. *Mediacom v. Rates Tech., Inc.*, No. 1:97cv10559, Dkt. No. 98 (D. Mass. March 22, 1999) (stipulation of dismissal). Absent final judgment, "claim construction is subject to change. . ." *Pfizer, Inc. v. Teva Pharmaceutical., USA, Inc.*, 429 F.3d 1364, 1377 (Fed. Cir. 2005). Moreover, according to Defendants, the claims at issue here are "significantly different" than those at issue in *Mediacom*:

> the *MediaCom* decision was issued in 1998—eleven years before the Reexamination of the '085 Patent resulted in a ***significantly different*** claim 1 being issued.

(Def. Br. 18) (emphasis added) Claims never reaching final judgment, much less "significantly different" claims, have no bearing on RTI's positions here. *RF Delaware, Inc. v. Pacific Keystone Techs., Inc.*, 326 F.3d 1255, 1262 (Fed. Cir. 2003) (declining to preclude party from a claim construction different than in earlier action, which settled before final judgment); *Lava Trading*, 445 F.3d at 1353 (reviewing an appeal from this Court and holding that a party is not precluded from raising claim construction positions on claim terms that were never part of an earlier final judgment).

While not bound by *Mediacom*, RTI in its opening brief provided both citations to this Court (RTI Br. 4, 7-8), noting among other things that the judge in *Mediacom*

required an expert — as is Mr. Walton — to review the disputed terms of the patents-in-suit:

> Claim 1 [of the '085 patent] presents questions that are sufficiently complex and technical that the Court would be remiss to impose its lay understanding on this patent claim without the benefit of expert guidance.

*MediaCom,* 4 F.Supp.2d at 29.

### 2. The Artisan's Viewpoint Always Controls the Trigger to Section 112(f)

Again, without support, Defendants contend that the viewpoint of the artisan should be ignored when determining whether and to what extent a disputed term is governed by 35 U.S.C. § 112(f). Yet, again, the very opposite is true: the Federal Circuit "assess[es] ***whether*** a claim limitation recites sufficient structure to avoid means-plus-function claiming from the vantage point of an ordinarily skilled artisan." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1364 (Fed. Cir. 2013) (emphasis added). And, when applying "§ 112, ¶ 6, knowledge of one skilled in the art can be called upon to flesh out a particular structural reference in the specification for the purpose of satisfying the statutory requirement of definiteness." *Creo Products, Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1347 (Fed. Cir. 2002); *Typhoon Touch Technologies, Inc. v. Dell, Inc.*, 659 F. 3d 1376, (Fed. Cir. 2011) (citing *Atmel Corp. v. Info. Storage Devices*, 198 F.3d 1374, 1382 (Fed. Cir. 1999)) (explaining that "[t]he requirement of specific structure in § 112, ¶ 6 thus does not raise the specter of an unending disclosure of what everyone in the field knows that such a requirement in § 112, ¶ 1 would entail."). Thus, the entire analysis depends upon what Defendants ignore: the viewpoint of a person having ordinary skill in the art.

### 3. "Means," Merely a Starting Point, Does Not Replace the Artisan's Viewpoint

Ignoring the viewpoint of a person having ordinary skill in the art, Defendants argue that the word "means" is a *per se* trigger for Section 112(f). (Def. Br. 8) No case so holds, and Defendants ignore at least four Federal Circuit rulings to the contrary. (RTI Br. 7) Those cases hold that inclusion of the word "means" in a claim is only a starting point of an analysis to determine whether Section 112(f) applies. Defendants' "error lies in [its] reliance on single words of the limitations, e.g., '[means],' as opposed to the limitations as a whole…" *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003).

This starting point, or presumption, is readily overcome whenever the claim as a whole provides some "structure, material or acts" for the artisan to understand what performs the function in question.[7] *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1304 (Fed. Cir. 1999) (reversing application of Section 112(f) as to "positioning means," explaining that although "the claim did not recite every last detail of structure disclosed in the specification for performing the claimed moving function," "[t]his court's case law, however, does not require such an exhaustive recitation to avoid § 112, ¶ 6."). That is so even if the claim language "covers a broad class of structures and even if the term identifies the structures by their function." (RTI's Br. at 7)

[7] While patent applicants have been "clearly enamored of the word 'means'," its use in many cases is merely "perfunctory." *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996) (holding that while "six of seven elements in that claim include the word 'means,' which occurs in the claim fourteen times," ***none of those occurrences*** amounted to means-plus-function elements within the meaning of § 112, ¶ 6.).

### 4. Prosecution History Statements Are Irrelevant to *Whether* Section 112(f) Applies

Throughout its brief, Defendants' main argument is that disputed claim language is governed by 35 U.S.C. § 112(f) because of arguments made during prosecution of the patents. The Federal Circuit has rejected such an argument: "alleged admissions in the prosecution history" are "***immaterial*** in evaluating whether the means-plus-function presumption is rebutted" because the "inquiry focuses on the claim language." *Robinson v. Cannondale Corp.*, 81 Fed.Appx. 725, 728, 2003 WL 22839336 (Fed. Cir. 2003) (holding that "'rotational indexing means' is not a means-plus-function limitation.") (emphasis added)[8]. As such, Defendants' entire reasoning should be disregarded.

The only test as to whether Section 112(f) governs a term is whether the claim as a whole identifies to a person having ordinary skill in the art some information about a class of structures that the artisan would use for the claimed function.

### 5. An Ambiguous Prosecution History, Even If Considered, Does Not Trigger Section 112(f)

In puffing up the importance of the prosecution history here, Defendants argue that it is "the most important" evidence, more important even than "the claim language itself" or "the specification." (Def. Br. 4) Defendants have it backwards: The Federal

[8] *See, also, Power Integrations,* 711 F.3d 1348, 1365 (Fed. Cir. 2013) ("The proper inquiry is ***whether the claim limitation itself***, when read in light of the specification, connotes to the ordinarily skilled artisan sufficiently definite structure for performing the identified functions"); *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1373 (Fed. Cir. 2012)("In rebutting the presumption, when a claim recites a function 'but then goes on to elaborate sufficient structure, material, or acts ***within the claim itself*** to perform entirely the recited function, the claim is not in means-plus-function format even if the claim uses the term means.'").

Circuit has consistently "warn[ed]" that the prosecution history is *less* useful for claim construction:

> [B]ecause the prosecution history represents an ongoing negotiation between the PTO and the inventor, "it often lacks the clarity of the specification and thus is ***less useful*** for claim construction purposes."

*3M,* 725 F.3d at 1325-26 (emphasis added)(quoting *Netcraft Corp. v. eBay, Inc*., 549 F.3d 1394, 1401 (Fed.Cir.2008) (quoting *Phillips*, 415 F.3d at 1317 (en banc)). None of the cases Defendants cite hold that prosecution history is the "most important" evidence, nor could those cases overrule the *en banc* decision in *Phillips*, finding the opposite: prosecution history is "less useful." *Id*.

Limiting a claim by use of language in the prosecution history is referred to as the "doctrine of prosecution disclaimer." Whether and to what extent claim scope has been disavowed is determined, again, through the viewpoint of "one of ordinary skill in the art." *Elbex Video, Ltd. v. Sensormatic Electronics Corp*., 508 F.3d 1366, 1371 (Fed. Cir. 2007) (finding no disavowal). "Precedent requires that, in order for prosecution disclaimer to attach, the disavowal must be both clear and unmistakable." *3M,* 725 F.3d at 1325 (reversing application of prosecution disclaimer to limit claim scope). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *Id*. at 1326; *01 Communique Lab., Inc. v. LogMeIn, Inc*., 687 F.3d 1292, 1297 (Fed. Cir. 2012) (reversing application of prosecution disclaimer as reexamination statement had more than one interpretation).

The "dispositive" prosecution history that Defendants rely upon as triggering Section 112(f) originates from snippets in an appeal brief that Defendants readily admit was "never lodged with the Board," *i.e.*, it was never considered. (Def. Br. 14)

Nevertheless, Defendants infer that the examiner would have relied upon the unconsidered appeal brief because the examiner issued the claims after the brief was filed. (Def. Br. 14-15) In fact, as the brief was not before the examiner; he maintained his rejection after the brief was filed until participating in an interview with the applicants.[9] (A-371) After the interview he issued the Notice of Intent to Issue *Ex Parte Reexamination* Certificate. (A-375-78)

Defendants further argue that applicants amended the claims to overcome the rejections by "including 'means' limitations . . ." (Def. Br. 9, 14) Again, Defendants err. As explained on the reexamination certificate, "matter printed in italics indicates additions made to the patent" and, clearly, none of the italicized language includes "means." (A-377)

Regardless, these cherry-picked snippets, if anything, are ambiguous and susceptible to multiple interpretations. Specifically, applicants "argued separately" that even if the examiner applied a means plus function analysis, structure existed in the specification supporting the claimed language. (A-264-65) Instead of quoting specific structure from the specification, applicants provided citations to areas of the specification that provided support. (*Id.*) In doing so, applicants never stated that Section 112(f) must govern the claimed language, whether the citations provided the only support, and never explained how much (or how little) structure the artisan would actually need to perform the various functional aspects of the claim.

[9] In this March 19, 2009 interview, the examiner summarized: "Generally discussed the attached proposed amendment to the claims. After initial review, the examiner noted that the proposed amendment appeared to include subject matter that may overcome the rejections, but the examiner needed to review the references more fully. The Patent Owner discussed their intentions of filing a formal amendment with similar limitations." (A-371)

Applicants' alternative argument to the appellate unit is understandable given that examination in the Patent Office follows "different standards" of claim construction for pending claims than courts follow in construing issued claims. *In re Swanson*, 540 F.3d 1368, 1378 (Fed. Cir. 2008)); *SAP America, Inc. v. Versata Dev. Grp.*, 107 U.S.P.Q.2d 1097, 2013 WL 3167735, *4 (Patent Tr. & App. Bd. June 11, 2013)(declining to adopt district court construction, explaining that there are "two claim construction standards: the Office's [Broadest Reasonable Interpretation] BRI construction and the district court standard set forth in *Phillips v. AWH*.")

Whereas the Patent Office applies the "broadest reasonable construction," courts do not, which has resulted in different constructions. *See, e.g., In re Am. Acad. Of Sci. Tech Ctr.*, 367 F.3d 1359, 1369 (Fed. Cir. 2004) (explaining that the different standards resulted in different constructions at the Patent Office and district court). Perhaps to account for a broadest reasonable construction standard, applicants argued alternatively that structure in the specification supported the claims in a means plus function analysis.

While ambiguous, it agrees with Mr. Walton's own expert analysis of the entire record including the prosecution history, which included all reexaminations[10], where he determined that it was consistent with the knowledge of a person having ordinary skill in the art. Specifically, Mr. Walton identified structure in the claim itself that was supported in the specification, and the identified structure was also described on some level within the overly broad prosecution history citations to the specification that Defendants rely on.

[10] Defendants urge this Court to ignore the Walton declaration because it "failed to analyze" the "relevant prosecution histories." (Def. Br. 6) Yet, the expert declaration expressly states that he reviewed the entire prosecution history and compared each disputed claim language to the information in the prosecution history. (Walton *passim*) The "prosecution history" which Mr. Walton reviewed, includes all "reexamination." See *Y2 Associates v. Phone-Mate, Inc.*, 837 F.2d 1097 (Fed. Cir. 1987).

Regardless, this ambiguous and unconsidered alternative analysis plays no role in determining whether Section 112(f) governs.

### C. Under Section 112(f), this Ambiguous Prosecution History Does Not Inform How Much Structure the Artisan Requires

After applying a *per se* trigger to Section 112(f), Defendants proceed to import language into the claim terms without regard to how much (or little) structure an artisan actually needs to understand the claim language. This is impermissible, amounting to importing into the claim "an unending disclosure of what everyone in the field knows that such a requirement in § 112, ¶ 1 would entail." *Typhoon,* 659 F.3d at 1376 (citing *Atmel,* 198 F.3d at 1382). Such a wholesale importation constitutes legal error. *Id*. RTI has provided the proper inquiry in Section V of its opening brief.

Because, as explained below, the expert's testimony shows that regardless of whether the Court applies Section 112(f), the amount of structure needed from the specification for an artisan to understand what class of structures perform as claimed is virtually identical to that discerned from the claim itself, Defendants' arguments appear to be a tempest in a teapot. And, even Defendants recognize this can be the case: with-drawing its contention that "jack means" was governed by Section 112(f) "because the issue has little, if any, consequence." (Def. Br. 17)

### D. Classes of Logic Known to the Artisan and Described in the Claims and Specification are Structure

Defendants, without factual or legal support, unequivocally argue: "'[l]ogic' is not a structure." (Def. Br. 13) Because of that, continue Defendants, RTI's constructions relying on logic known to the artisan are "legally indefensible," amounting to "purely

functional claiming," and "is yet another example of RTI making-up law contrary to established precedent." (Def. Br. 12-13)

Yet, the only "established precedent" Defendants cite for its contention that logic is not structure recognizes the opposite: "***structure*** for . . . a computer-implemented function ***is*** the ***algorithm***. . ." *Aristocrat Technologies Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) (emphasis added). There, the court distinguished a "general purpose computer," which "can be programmed to perform very different tasks in very different ways," from a computer "programmed to perform particular functions pursuant to instructions from program software." *Id*. The former lacks structure, the latter provides structure.

*Aristocrat* is not alone in recognizing logic as structure. *Typhoon*, 659 F.3d at 1385 (reversing indefiniteness on "means for cross-referencing" because the algorithms provided structure). "Precedent and practice permit a patentee to express that procedural ***algorithm*** 'in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that ***provides*** sufficient ***structure***.'" *Id*. (emphasis added); *see Apex*, 325 F.3d at 1373 (holding that "logic" provided additional structure as an identifier of the term circuit: "'circuit' with an appropriate identifier such as 'interface,' 'programming' and 'logic,' certainly identifies some structural meaning to one of ordinary skill in the art."). The unchallenged evidence of record here establishes that classes of logic known at the time and described in the claims and specification, like *Aristocrat*'s "instructions from program software," "perform particular functions" — the claimed functions. (Walton *passim*). As such, construing claims according to these known classes of logic limits the claim so as not to allow pure functional claiming.

Thus, the above claim construction analysis, from beginning to end, depends entirely on what a person having ordinary skill in the art understands the terms to mean — nothing more, nothing less, no exceptions. Just as the Federal Circuit has vacated claim constructions that ignore the artisan's viewpoint, so should this Court disregard Defendants' brief that fails to apply any viewpoint for its proposed constructions, much less the viewpoint of a person having ordinary skill in the art, established in the unchallenged Walton expert declaration and supporting exhibits.

With Defendants' fundamental errors in mind, RTI next explains Defendants' errors specific to each of the disputed claim language.

## III. DEFENDANTS' ERRORS REGARDING SPECIFIC CONSTRUCTIONS

### A. Construction of Disputed Terms in Claim 1 of the '085 Patent

#### 1. device

Defendants contested RTI's construction in the Joint Claim Construction submission (Dkt. No. 70) but their claim construction brief fails to even address the issue. Defendants thus apparently concede RTI's proposed construction "device" is not a claim limitation. As such, RTI requests this Court adopt its construction.

#### 2. comprising

Defendants, although misstating[11] RTI's construction, do not contest it. Defendants thus apparently concede RTI's proposed construction that "comprising" is a

[11] Compare RTI's actual construction ,"comprising is a transition term linking the preamble to the body of the claim," (Dkt. No. 70) with Defendants' version, "'comprising' means 'including'." (Def. Br. 16)

transitional phrase linking the preamble to the body of the claim. As such, RTI requests this Court adopt its construction.

### 3. a housing forming an enclosure and comprising

In their own words, "Defendants' construction requires that a ***single*** housing include both the first and second jack means." (Def. Br. 15) (emphasis added) Defendants, for three separate reasons, seek to have the Court import the word "single" into the claim. All have been explicitly rejected by the Federal Circuit.

Defendants' primary evidence that the claims require a "single" housing for both jacks is that the patent "consistently and exclusively refers to 'A housing' or 'the housing'." (Def. Br. 15-16) (underline in original) But, "the articles 'a' and 'the' do not suggest singularity." *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1350 (Fed. Cir. 2005); *see 01 Communique,* 687 F.3d at 1299 (construing a location facility as "may be distributed among one or more locator server computers"). Rather, under Federal Circuit law, these terms are open-ended and mean "one or more," or "at least one." *Accent Packaging Inc. v. Leggett & Platt Inc.,* 707 F.3d 1318, 1326 (Fed. Cir. 2013). This is especially so given that, as Defendants' recognize, the "patent consistently and exclusively" uses "a" or "the" (Def. Br. 15) — it *never* "evince[d] a clear intent" to limit the terms by using words like "one" or "single" in the claims or specification. *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008)(reversing limiting the term to one); *see also Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1086 (Fed. Cir. 2009) (holding "the claim term 'data acquisition unit' is not limited to a single structure but may comprise multiple physically separate structures"). Moreover, here the specification, when referring to use of housings and

enclosures, states that "any configuration can be used depending on the designer's choice . . ." (Col. 3:27-31; Walton 10)

Defendants' secondary argument is that the patent describes one embodiment that uses a housing and an enclosure. (Def. Br. 15-16) But, again, this argument has been "expressly rejected." *Phillips*, 415 F.3d at 1323 (noting its precedent, "[i]n particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment" in part because "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments"). And here, the inventor specifically noted that the artisan could use other configurations and embodiments. (Col. 3:28-31; 6:64-67)

Defendants, in one further effort, argue that the "entire concept of the invention was that there would be <u>one</u> housing that enclosed <u>all</u> the elements of the claims." (Def. Br. 16) (underline in original). Defendants' repeated underscoring of their own argument cannot make those words magically appear in the patent or its claims. Nor do they. The word "one" never appears, and the word "all" only appears three times: "all long distance calls," "all digits," and "all carriers." The inventor certainly knew how to use these words and chose not to use them with respect to housing or enclosure.

Further, Defendants' contention that the "entire concept of the invention" requires "<u>one</u> housing" (Def. Br. 16) is equally fictitious. The specification nowhere identifies a need for a single housing as a problem to be solved. Instead, the inventors recognized that consumers were unwilling to purchase complex phones that route calls and thus addressed consumer desires by inventing call routing technology that among other things

is "separate and apart from the telephone." (Col. 1:21-35; 1:38-43) Further, Defendants fail to even address the fact that the claims were specifically amended to make clear that no single enclosure need include "all the elements of the claims." (Walton 10, citing prosecution history)

Defendants, remaining silent as to Mr. Walton's expert declaration, therefore concede that the artisan, having read the claims, specification, and prosecution history, views the invention as RTI construes the disputed language. (Walton 9-11) Thus, RTI requests this Court adopt its construction.

#### 4. first jack means for connection to said first telephone; second jack means for connection to said network

Defendants expressly adopted RTI's proposed construction that this claim language is not governed by 35 U.S.C. § 112(f) and employs ordinary meaning to a person having ordinary skill in the art. (Def. Br. 17)

Yet, despite this concession, Defendants invite the Court to restate this claim language using words from a mere "general example" provided by Mr. Walton. (Walton 12, 14) When the claim language is already clear to a person having ordinary skill in the art, "restating every claim term" is at best "an obligatory exercise in redundancy," which invites errors in claim construction and should be avoided:

> The Court is not persuaded, however, that substituting the term "by itself" for "unsupported" would permit a trier of fact to better understand the meaning of that term. Gerson has not explained how the two terms are different or argued that "by itself" offers any better explanation of the term "unsupported." Claim construction "is not an obligatory exercise in redundancy," and the Court will not merely substitute synonyms for disputed claim language. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed.Cir.1997). The term "by itself" is synonymous with

> the asserted claim term "unsupported," and to the extent that the terms are distinguishable, the Court declines to construe claim 1 to include the limitation "by itself." *Cf. Motorola, Inc. v. VTech Commc'ns, Inc.*, No. 5:07CV171, 2009 WL 2026317, at *8 (D.Minn. July 6, 2009) ("With regard to meaning, where additional language may be unduly limiting, confusing, or redundant, it is in a court's power to determine that no construction is necessary. A court may decline to adopt constructions that violate claim construction doctrine, such as improperly importing limitations, and may still construe terms to have their ordinary meaning.").

*3M Innovative Properties Co. v. Louis M. Gerson Co., Inc.*, 2010 WL 4106712, *6 (D. Minn. 2010).

As such, this Court should avoid restating that which is clear and adopt RTI's construction as a "first jack for connection to said first telephone" and a "second jack for connection to said network."

**5. switch means operatively connected to said first jack means for disconnecting said first telephone from said network during routing of a telephone call from said first telephone**

Defendants wholly fail to address the Walton declaration that a person having ordinary skill in the art recognizes specific structure within the claim as a whole that informs such persons to use a "switch" to operate as claimed. By silence, they concede the point.

Ignoring the viewpoint of one of ordinary skill in the art — relying solely on portions of an unconsidered appeal brief filed during reexamination — Defendants provide their own interpretation of this claim language as (1) governed by 35 U.S.C. § 112(f) and (2) including *everything* from the specification in "Ref. No. 36, Col. 3, lines

51-64, Fig. 2," (Def. Br. 18-21) — one hundred twenty-one (121) words and an entire figure from the specification!

First, as explained in Section II.B.4 above, prosecution history is simply not relevant to whether a disputed claim term is governed by 35 U.S.C. § 112(f).

Second, as explained, words from the prosecution history must not be imported into this claim language when — as here — the alleged disavowal is "amenable to multiple reasonable interpretations" and is not "clear and unmistakable." See Section II.B.5 above.

Specific to this disputed language, Defendants strip these bare citations from their context. In the omitted[12] context, the inventor stated the "switch means" was a "switch," and although the specification in one embodiment used a "2 From C" switch, artisans may use other switches:

> The ***"switch means" consists of one or more switches*** for controlling a circuit so that one state or position permits signaling between the originating telephone and the network and a second state or position disables signaling between the originating telephone and the network. In other words, the switch means is a mechanism for isolating the telephone addressing signals (i.e., the number dialed) from the telephone network.
>
> The embodiment of the switch means element in the specification includes the "2 Form C" switch arrangement shown in Fig. 2 (block 36) of the patent. A "2 Form C" switch is also known in electrical engineering as a "double-pole, double-throw" switch. There are ***many configurations of switches***--whether Form A, B, or C switches, shunting mechanisms, relays, or other mechanical or solid state devices--***that could be easily substituted*** for the 2 Form C switch to accomplish the same function (disconnecting the

[12] In the block quote that follows, Defendants quoted the second paragraph while chopping off the first paragraph (Def. Br. 19) which clearly shows that "switch means" is a "switch."

> originating telephone form the network), to get the same result (isolation of the originating telephone from the network during the period when the call is being routed).

(A-68, ‘085 Reexam, July 26, 2007 Response at 25) This additional context showing that the switch means is a class of switches is also consistent with the specification, which refers to the invention as including a “switch” (Abstract; Col. 1:64; 1:67; 2:5; 2:18) and invites the artisan to use “other arrangements.” (6:64-67) Mr. Walton, recognizing this teaching, explained that the artisan, having read the claims, specification, and prosecution history, “would know how to choose among various switches that perform as claimed,” and provided exemplary evidence from an art-specific dictionary of a class of structures known in the art as switches. (Walton 16-17)

Defendants’ remaining citations to the appeal brief concern statements that simply describe a reference called “Vodavi.” (A-276 to A-282) Defendants contend that Vodavi disclosed a switch and therefore the claimed switch means cannot be a class of switches. Defendants entirely miss the point of the discussion it cites.

The actual discussion focused specifically on Vodavi’s “***COT8 or EMT4*** trunk selector boards,” and in that discussion, the issue wasn’t simply whether Vodavi disclosed a “switch” that was a “switch means” but whether its disclosure would “meet *the claim limitations directed to* the switch means *or the claim limitations reciting the manner in which the switch means is connected*.” (A-276) In other words, did Vodavi meet other aspects of the claim language relating to, among other things, the “manner in which the switch means is connected?” Vodavi did not disclose all such claimed limitations. One could use a switch as a paper weight too, but such use would not meet “the claim limitations reciting the manner in which the switch means is connected.” Because Vodavi did not disclose the claimed manner in which the switch was connected, the only way to

disconnect it from the network would require, unsurprisingly, unplugging the jack. (A-278)

To the extent that applicants' above remarks "are broader than necessary to distinguish the prior art, the full breadth of the remark is not 'a clear and unambiguous disavowal of claim scope as required to depart from the meaning of the term [switch] provided in the written description.'" *3M Innovative Props. Co. v. Avery Dennison Corp.,* 350 F.3d 1365, 1373 (Fed.Cir.2003) (quoting *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 833 (Fed.Cir.2003)).

Thus, as explained in the Walton declaration, the context surrounding Defendants' quoted citations are consistent with the artisan's understanding that the claim as a whole, as does the specification, describes structure known to the artisan as a "switch." (Walton 16-17) Defendants leave unchallenged the facts of Mr. Walton's expert declaration, and RTI requests this court adopt its construction.

**6. disconnecting**

"Disconnecting" is part and parcel to the above disputed language concerning a "switch." Defendants totally ignore the viewpoint of a person having ordinary skill in the art, which Walton expert declaration provides, who understands disconnecting as used in this claim in the context of the specification and prosecution history to mean the interruption of a connection (disconnecting communication such as signaling) (Walton 18-19; RTI Opening Br. 13). Instead, Defendants rely exclusively on two arguments: 1) *Mediacom* prevents RTI from proposing its construction, and 2) RTI disclaimed its construction in the above unconsidered appeal brief. Neither is correct.

But *Mediacom*, as explained in Section II.B.1 above, is inapposite. Defendants' argument is two-faced: while implying that *Mediacom* controls as to "disconnecting" here, it took the exact opposite position as to the same term "disconnecting" within the above disputed language concerning "switch" just discussed. See Section III.A.5 above.

As to the alleged prosecution disclaimer, Defendants point to the same unconsidered appeal brief discussed in Section II.B.4 to II.C above.

But, just as Mr. Walton explained, the prosecution history is consistent with the viewpoint of a person having ordinary skill in the art and supports RTI's construction. (Walton 19) Defendants cite two descriptions of the prior art, misconstruing each.

Defendants first cite to A-279, but omit both the beginning of the paragraph and the surrounding paragraphs, which makes clear the applicants were discussing "COT8 or EMT4 trunk selector boards" in the reference "Vodavi." (A-278 to 279) Applicants simply recognized that because Vodavi failed to disclose its hardware disconnecting the *signaling* (e.g., "can pick up the receiver at any time to obtain a ***dial tone***…"), the only way to disconnect in Vodavi would require its jack to be "pulled from the wall receptacle" and Vodavi does not even disclose doing that. (A-279) Obviously, the claim of the patent-in-suit does not require anything to be pulled from a wall.

Defendants' second cite also omits important context. Its block quote to A-282 discussing the "Isotec" reference chops out that it "operates essentially the same way as the Vodavi system," and "[l]ike Vodavi…." (A-282) Thus, the same reasoning discussed above applies equally here: *i.e.*, Isotec fails to disclose disconnecting the signaling.

That neither Vodavi nor Isotec disconnected the signaling is consistent with other parts of the same reexamination. As explained above, Defendants block quote a

paragraph from page 25 of applicants' July 26, 2007 Response to the examiner during the reexamination but — conspicuously — fail to quote the paragraph immediately preceding, which follows:

> The "switch means" consists of one or more switches for controlling a circuit so that one state or position permits signaling between the originating telephone and the network and a second state or position ***disables signaling*** between the originating telephone and the network. In other words, the switch means is a mechanism for isolating the telephone addressing ***signals*** (i.e., the number dialed) from the telephone network.

(A-68, July 26, 2007 Resp. at 25). Thus, *the very same page* of the prosecution history cited by Defendants makes clear that the issue of disconnecting is that of *signaling*. With such a reasonable interpretation, the prosecution history is simply not a disavowal of claim scope, let alone a clear and unmistakable disavowal. As such, no disclaimer occurred here. *Grober v. Mako Products, Inc.*, 686 F.3d 1335, 1342 (Fed. Cir. 2012), *reh'g denied,* (Sept. 14, 2012) (reversing application of prosecution disclaimer to limit claim scope because reexamination statement ambiguous); *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008).

Because neither *Mediacom* nor the prosecution history prevents RTI's construction (indeed the prosecution history supports RTI) and Defendants, by silence, concede the construction of disconnecting from the viewpoint of a person having ordinary skill in the art, RTI requests this Court adopt the only proposed construction that adheres to the artisan's viewpoint — RTI's.

**7. means operatively connected to said switch means for generating a current through said switch means to the first telephone corresponding to a current provided by said network, when the first telephone is disconnected from said network by said switch means**

8. **means operatively connected to said switch means for detecting and storing said telephone number originating from the first telephone**

9. **means for addressing said database means for identifying a plurality of communication switch paths to said second telephone and the cost rate of each path**

10. **means actuated subsequent to the detection of said telephone number originating from said first telephone for comparing the cost rate of each path so as to determine a least cost route**

11. **means operatively connected to said switch means and said second jack means for generating a number sequence corresponding to a desired carrier so that said call is routed through said second jack means to the selected communication path and carrier to establish a switched connection between said first telephone and said second telephone phone**

Defendants' treatment of these five disputed claim phrases suffer from virtually identical flaws, so RTI addresses them together. (Certain arguments that relate only to specific disputed claim language are addressed below.)

In disputing RTI's proposed construction on these five claim phrases, Defendants, again, ignore the viewpoint of a person having ordinary skill in the art and, by silence, concede that the construction as understood through the viewpoint of the artisan, as explained in the Walton expert declaration. Rather, they again contend that 1) *Mediacom* forecloses RTI's construction, and 2) the same unconsidered appeal brief invokes Section 112(f). Neither is true. As to *Mediacom*, see Section II.B.1 above.

As to the unconsidered appeal brief, as explained in Section II.B.4 above, it is not relevant in determining whether Section 112(f) governs the disputed claim language. And even if the language is considered, Defendants propose to import, from applicants'

alternative argument, bare citations to wholesale portions of the specification.[13] For none of these citations did applicants state that all of the cited language and figures were necessary for a person having ordinary skill in the art to understand what performs as claimed. See Sections II.B.4 to II.C above. This ambiguous prosecution history, and wholesale portions of the specification, taken from multiple columns and entire figures (in one case, *three*), cannot be imported into the disputed claim language. *Grober*, 686 F.3d at 1342; *Computer Docking Station*, 519 F.3d at 1375. Defendants' kitchen-sink type of importing bare citations — instead of specific language — leaves the Court with no guidance as to actually *construing*[14] claims and yet again underscores that claim construction at this point is premature. See Section I above.

Because neither *Mediacom* nor prosecution history prevents RTI's construction (indeed the prosecution history supports RTI) and Defendants, by silence, concede the construction of disconnecting from the viewpoint of a person having ordinary skill in the

---

[13] Respectively, the bare citations Defendants propose to import are:

**7.** Ref. No. 38, Col. 3, lines 57-61, Col. 4, lines 22-27, Fig.2
**8.** Ref. No. 88, Col. 4, lines 40-43, Fig. 2
**9.** Ref. No. 50, Col. 6, lines 2-30, Fig. 5
**10.** Ref. No. 50, Col. 2, lines 10 and 11, Col. 4, lines 1-16, Col. 6, lines 22-28, Figs. 2 and 5
**11.** Ref. No. 80, Col. 2, lines 11-18, Col. 4, lines 33-38, Col. 6, lines 26-28, Figs. 2, 4 and 5

[14] Construing (interpreting) claims is "a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005); *U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement."); Black's Law Dictionary (6th ed. 1991) (Interpretation "is the art or process of discovering and expounding the intended significance of the language used. . . .")

art, RTI requests this court adopt the only proposed construction that adheres to the artisan's viewpoint — RTI's.

**a. Reply Argument Specific To Certain Terms**

In addition to Defendants' cookie-cutter arguments for Nos. 7 through 11 above, Defendants make additional arguments with respect to Nos. 7 and 10.

**b. Term No. 7**

As for No. 7, Defendants readily admit that the claim uses "plain language." (Def. Br. 24) As such, this Court should not further construe it. *3M*, 2010 WL 4106712 at *6 (citing *U.S. Surgical*, 103 F.3d at 1568).

After recognizing the language is clear, Defendants attempt to recast it, importing additional words, such as requiring that "the telephone [be] attached to the 'housing,'" neither of which are in the disputed claim language, and attempt to justify their import using the same unconsidered and ambiguous appeal brief. To hide the ambiguity, Defendants again camouflage the particular discussion by chopping the fact that applicants were describing "COT8 and EMT4" hardware, and that because Vodavi did not disclose providing current through any switch, it could not meet the claimed limitation. (Compare Def. Br. 24-25 with A-279) Since by Defendants' admission, the language is "plain," RTI requests this Court refrain from importing Defendants' words therein.

**c. Term No. 10**

As for Term No. 10, Defendants leave unchallenged Mr. Walton's expert declaration and supporting exhibits showing that the claim and specification both inform

a person having ordinary skill in the art to use a *known* class of logic operations for the claimed function. By silence, Defendants concede the artisan's viewpoint.

Instead, Defendants allege the language is indefinite because logic cannot provide structure and because the prosecution history precludes the structure identified by Mr. Walton. But as explained in Section II.D above, classes of known logic provide structure, just as Mr. Walton has identified.

Further, the ***actual*** prosecution history is consistent with RTI's proposed construction and the facts presented by Mr. Walton. Defendants disingenuously attempt to pass-off their own language as a block quote from A-291 in the unconsidered appeal brief. (Def. Br. 28) But, that language does not exist as quoted! The closest language to what Defendants purport to quote is on page A-290, but Defendants' quotation is simply inaccurate and misleading. To make this perfectly clear, RTI quotes this portion of the appeal brief, with Defendants' additions and deletions to the appeal brief shown as underscored and struck, respectively:

> Upon making a call, an ARS system looks at the dialed number and then simply selects the ~~appropriate table~~ route based on the dialed number in the order or predetermined priorities previously stored in the route tables for the ~~destination, the~~ time of day and day of week~~. The system looks at the table and selects the route with the highest priority~~ (after undesirable routes are eliminated, for example, because of lack of capacity, insufficient transmission speed or other technical deficiency). ~~If that route is not available, it looks for the route with the next highest priority, etc. ARS required little memory capacity and no ability to retrieve and compare stored cost rates for various carriers.~~
>
> ~~LCR tables contain different information than ARS tables. LCR tables contain the cost rates related to possible routes. They do not contain lists of routes in order of priority.~~ Further, the information from LCR tables is used by the telephone system in a different manner than that obtained

> from the ARS route tables. In LCR, the stored information is compared to ~~determine~~ select a route. In ARS, the route is selected based upon the stored route priorities ~~formed outside the system~~.

(Compare A-290 with Def. Br. 28) When one reviews the *actual* prosecution history, rather than the faux version presented by Defendants, as well as pages A-305-06 of the same appeal brief, one discovers that the history is in-line with Mr. Walton's expert declaration.

Specifically, the entire description is of Automatic Route Selection (ARS), which does not — contrary to Defendants' unsupported attorney argument — use the class of logic operations identified by Mr. Walton and known by the artisan. Instead, as explained by applicants, ARS systems merely "select a route from the appropriate hierarchy table" that has been "previously stored" and is in a "predetermined priority." (A-305-06) In other words, the cited art does not use the claimed comparison logic.

Defendants' position is supported by misquoted portions of the prosecution history and unsupported attorney argument. Yet Defendants fail to challenge that the artisan recognizes in the claim and specification known classes of logic. For these reasons, RTI requests this court adopt the artisan's viewpoint and, thus, RTI's construction.

#### 12. means for generating a current

Defendants, after disputing this phrase, do not argue it separately from the disputed phrase explained in Section III.A.7 above.

### B. Construction of Disputed Terms in Claim 1 of the '769 Patent

#### 1. at a predetermined time and date

Defendants, with this term, repeat their mantra that the *Mediacom* decisions and the prosecution history prevents RTI's construction. (Def. Br. 31-32) In fact both support RTI's construction.

"Defendants incorporate by reference Judge Young's analysis . . ." (Def. Br. 31), which follows: "the words used in the claim are simple English," "the claim itself speaks clearly and unambiguously" and "yields up its meaning quite readily." *MediaCom*, 4 F.Supp.2d at 32. Mr. Walton comes to the same conclusion. (Walton 41) The proper construction, therefore, is "at a predetermined date and time."

Judge Young, however, despite concluding that the phrase was clear on its face, added "a substantial period in advance of the call," although such was never at issue. Such importation not only runs afoul of Federal Circuit law prohibiting the importation of terms when they are clear, *3M*, 2010 WL 4106712 at *6 (citing *U.S. Surgical*, 103 F.3d at 1568), but the additional language creates confusion (which call? what is a substantial period in advance of the call?) and is otherwise incorrect.

As Mr. Walton explained, the purpose of a predetermined dated and time, according to the '769 Patent specification, Col. 10, lines 6-10, is to "stagger connections with the rate provider, thus assisting in load balancing." (Walton 41) If predetermined meant "substantially in advance of [every?] call," no load balancing would occur; instead, the load would follow the call volume. Thus, the gratuitous phrase makes no sense in the context of the specification.

It also conflicts with the very prosecution history language cited by Defendants, A-406, which explains that "predetermined date and time" occurs by using a "particular date and time" as opposed to using time intervals that are not predetermined. Thus the prosecution history states nothing about whether the date and time must be determined substantially in advance of a call (or all calls?), whichever is being referred to.

As explained in Section II.B.1 above, *Mediacom* does not bind RTI's construction, and the artisan, "in the context of the remainder of claim 1, the specification, the prosecution history, and [his/her] knowledge" (Walton 41), views the claim language as clear on its face: a predetermined date and time. The Court should follow the artisan's viewpoint.

**2. a data transfer line**

Defendants propose to construe four words ("a data transfer line") as the following

> A wire operatively connected to a modem associated with a call rating device on one end and a phone network on the other.

(Def. Br. 32) Defendants' analysis consists of arguing that their construction "***merely specifies what is already in the claim language***." (Def. Br. 32)(emphasis added) Yet perplexingly, except for the word "a,"[15] ***none*** of the words Defendants propose are already in the claim language being construed! Defendants' "construction" is merely a thinly veiled attempt to import additional and superfluous claim limitations into an element that plainly does not contain them.

[15] Again, "a" means one or more.

Defendants' proposed construction conflicts with numerous claim construction doctrines, such as claim differentiation. Defendants' construction would import into independent claim 1 the limitations in dependent claim 2, which reads:

> The method according to claim 1 wherein the step of connecting via a data transfer line includes the step of *connecting the call rating device to a telephone network via a modem and calling the rate provider*.

Defendants' proposed construction is thus impermissible. *RF Delaware*, 326 F.3d at 1264 (reversing for importing words from dependant claim into the claim from which it depends).

Defendants' importation of the limitation of a physical "wire" is likewise without basis: the word "wire" never appears in any of the claims or the specification! And, as Mr. Walton recognized, the specification describes various communication paths. (Walton 42, citing Col. 3:44-49)

Defendants having provided scant and misleading analysis for a legally impermissible construction, RTI requests that this Court adopt the construction as understood through the viewpoint of a person having ordinary skill in the art: a data transfer line.

**3. call rating device**

Here, Defendants doubly err, proposing to impose 35 U.S.C. § 112(f) onto the language and, as above, import language that they have created.

As to Section 112(f), the word "means" is not to be found and, thus, a presumption exists that the statute does *not* govern. That presumption is not easily overcome. *See Lighting World, Inc. v. Birchwood Lighting, Inc.,* 382 F.3d 1354, 1358

(Fed.Cir. 2004) ("Our cases make clear . . . that the presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome.")

That presumption is not overcome when the term as used in the claim (1) does not — as here — have an associated function or (2) when it provides some structure. *Rodime*, 174 F.3d at 1302. *See Flo Healthcare,* 697 F.3d at 1374 (Federal Circuit is "unwilling to apply" the means-plus-function provision "without a showing that the limitation essentially is devoid of anything that can be construed as structure.")

Reviewing the disputed claim language, Defendants cite no *claimed* function corresponding to "call rating device;" and there is none. Thus, for this reason alone, Section 112(f) does not govern here. *See Rodime*, 174 F.3d at 1302. ("a claim element that uses the word 'means' but recites no function corresponding to the means does not invoke § 112, ¶ 6.")

Further, the term provides structure known to a person having ordinary skill in the art. Defendants claim that before the invention of the '769 Patent no call rating device existed. Yet, just as Mr. Walton confirms that such devices were known, the '769 Patent specification explains that call rating devices were known, and identifies, for example, the invention in the earlier filed '085 Patent as a call rating device. (Col. 1:25-32)

Other more primitive call rating devices also existed, including those cited by Defendants. Specifically, Defendants cite to prosecution history of the '085 Patent that described more primitive call rating devices. (Def. Br. 28, citing A-291, A-305-306) While those prior art call rating devices do not include the claimed remaining limitations in either the '085 or '769 Patents (*e.g.,* least cost routing or the claimed updating), devices certainly existed that rated calls in some way, just not the claimed way. Thus, as

shown in the specification, prosecution history, and expert testimony, the artisan understood a call rating device as having structure. (Walton 43) Thus, for this second, independent reason, the presumption that 35 U.S.C. § 112(f) does not govern is not overcome.

Defendants' proposed construction also imports words with no known origin or reason. With no citation or origin, no one can understand what Defendants mean by its words. Some of these words appear fragmented in the claims elsewhere, which would add redundancy and should be avoided. And, what Defendants mean by "an identifiable physical component," "incorporating the rate information," or "managing calls" — none of which appears in the claims, specification, prosecution history, prior art, or any expert's knowledge — is a complete mystery.[16]

As such, this Court should decline to read made-up limitations into call rating device. Instead, RTI requests this Court apply the construction from the viewpoint of a person having ordinary skill in the art: call rating device.

**4. transmitting over the data transfer line**

Again, Defendants' arguments are not comprehensible. Defendants claim that "RTI's proposed construction is unlimited by the terms of the claims . . ." (Def. Br. 33) yet the ***only*** terms RTI proposes is the identical language used in the claim — it is, thus, precisely limited by the claim, no broader, no narrower. These words are precise and clear to a person having ordinary skill in the art. (Walton 33)

[16] Do these words have significance to the accused device? Such a mysterious construction underscores that claim construction without the needed discovery providing context of the accused device is premature, and should be avoided as an abstract exercise, doomed to be repeated. See Section I.

Again, Defendants proceed to import their own made up words, having no origin, which breed confusion, ambiguity, and redundancy. Defendants' word "wire," as discussed above, never appears anywhere in the claims or specification. Nor does "conveying," whatever that means. And such a word is certainly, in the context of this art, less precise than the claimed and described "transmitting."

Finally, Defendants seem to argue that because the word "the" precedes "data transfer line," the claim is limited to a *single* data transfer line. But, "the use of a definite article ('said' or 'the') to refer back to an initial indefinite article does not implicate, let alone mandate the singular." *Baldwin*, 512 F.3d at 1342-43. As explained elsewhere, "the articles 'a' and 'the' do not suggest singularity." *Free Motion Fitness,* 423 F.3d at 1350; *see 01 Communique,* 687 F.3d at 1299 (construing a location facility as "may be distributed among one or more locator server computers").

Indeed, none of Defendants' proposed words are of any help. Thus, RTI requests that this Court apply the construction from the viewpoint of a person having ordinary skill in the art: transmitting over the data transfer line.

#### 5. indicia identifying the call rating device and the date and time of the last update of the billing rate parameters

As to this language, Defendants have "agreed" with RTI's construction. (Def. Br. 34) Thus, RTI requests this court adopt RTI's proposed construction: indicia identifying the call rating device and the date and time of the last update of the billing rate parameters.

**6. verifying if billing rate parameters should be updated**

Here, Defendants, again, improperly attempt to import words into the claims. Specifically, Defendants impose the unnecessary restriction that this step "must be done by the rate provider and not the call-rating device." (Def. Br. 34) Such a construction conflicts with the specification, which never states that the rate provider must execute this step. Indeed, the claim and specification allow for either arrangement.

Defendants rely on the claim phrases "connecting" and "transmitting" as requiring that the rate provider handle verifying. But, just as connecting at a predetermined date and time allows for multiple components to handle it, so does the verifying step:

> MediaCom insists that, as a matter of logic and grammar, the phrase "predetermined time and date" requires that this Court identify by whom the time and date are predetermined. MediaCom contends that the rate provider, and not the individual user, must perform that function. Rates responds that the claim need not and does not identify who must determine the time and date of the connection, but rather allows a variety of arrangements.

*MediaCom*, 4 F.Supp.2d at 31. The court held, "[t]he language does not require that the person responsible for that selection be identified in order to give meaning to the claim." While not binding, the court's reasoning on this point is sound. Thus, the same is true for the verifying step.

Thus, RTI requests this court adopt RTI's proposed construction: verifying if billing rate parameters should be updated.

**7. transmitting from the rate provider to the call rating device**

Defendants here merely incorporate the same reasoning as just discussed.

Thus, RTI requests this court adopt RTI's proposed construction: transmitting from the rate provider to the call rating device.

## CONCLUSION

For the foregoing reasons, RTI requests that this Court defer claim construction until RTI is provided with sufficient discovery to understand the operation of Defendants' accused system, or alternatively, construe the above disputed claim language as proposed by RTI.

Respectfully Submitted,

Dated: November 18, 2013
New York, New York

SPRINGUT LAW PC

By: /s/ Milton Springut

Milton Springut
Tal S. Benschar
Scott Spencer
75 Rockefeller Plaza, 19th Floor
New York, New York 10019
(212) 813-1600

*Counsel for Plaintiff*
Rates Technology Inc.